# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01124-SCT

*ILLINOIS CENTRAL RAILROAD COMPANY, HERBERT BENNETT AND J. R. WRIGHT*

*v.*

*DEMETRIUS HAWKINS; LUCIOUS ROBINSON, INDIVIDUALLY, AND AS FATHER AND NEXT FRIEND OF SHUNTAI ROBINSON, SHERITA ROBINSON, AND JUANITA ROBINSON, MINORS; KEVIN MABRY; TIBITHAL O. SELDERS; ALVIN P. HAYMER, JR.; DENNIS HAYMER; IRA HAYMER; MILLER HAYMER; ANNETTE HAYMER FORT; LARRY HAYMER; STEPHANIE HAYMER PERKINS; AND BERTHA LEE WINTERS*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/18/2000 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | HOLMES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | GLENN F. BECKHAM |
| | EDWARD BLACKMON, JR. |
| ATTORNEYS FOR APPELLEES: | PAT M. BARRETT, JR. |
| | ISAAC K. BYRD, JR. |
| | HIAWATHA NORTHINGTON |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED.& RENDERED IN PART - 10/03/2002 |
| MOTION FOR REHEARING FILED: | 10/17/2002 |
| MANDATE ISSUED: | |

**BEFORE SMITH, P.J., WALLER AND CARLSON, JJ.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This case comes to the Court on appeal following a long, arduous process in the courts of Holmes County. It stems from a September 14, 1994, accident where a locomotive belonging to Illinois Central Railroad ("ICR") collided with a vehicle driven by LouBertha Cox and occupied by two of her sons, Terry Hawkins ("Terry") and Christopher Hawkins ("Christopher"). Cox and her two sons died in the collision. A wrongful death action was filed the following year against ICR and two employees ("ICR" collectively) in charge of the subject locomotive, Herbert Bennett, the engineer, and J.R. Wright, the conductor. Bertha

Winters, Cox's mother, filed an action for negligent infliction of emotional distress, as a result of her having witnessed the accident.

¶2. Both the wrongful death and Winters's suit were stayed during the pendency of a lawful heir determination. On October 1, 1998, after the heirship determinations were finalized, an order was entered lifting the stay. The two actions were consolidated for trial in March of 1999. Following this, discovery continued resulting in contempt sanctions against ICR, which resulted in an earlier appeal to this Court, *Illinois Cent. R.R. v. Winters*, 815 So.2d 1168 (Miss. 2002).

¶3. A trial in this matter began on October 4, 1999. It, however, resulted in a mistrial after one of the Plaintiffs' experts violated a pre-trial order while testifying. The trial presently being appealed from began on September 11, 2000. It resulted in $4.8 million in actual damages being awarded to Plaintiffs in the following amounts: the Beneficiaries of Terry were awarded $150,000; the Beneficiaries of Christopher were awarded $150,000; Cox's sole beneficiary, her remaining son, Demetrius Hawkins, was awarded $3 million; and Winters was awarded $1.5 million. The jury found ICR 85% liable, Bennett 5% liable, Wright 5% liable and Cox 5% liable. The trial court then found that there was sufficient evidence to allow the jury to consider the issue of punitive damages. The trial court did find that Winters was not eligible for punitive damages. The jury returned with a $5.2 million punitive damage verdict against ICR. Aggrieved, ICR, Bennett, and Wright appeal from the judgment entered on the verdicts below.

## FACTS

¶4. The collision that is the subject of this appeal occurred at the Mileston crossing in Holmes County. The railroad tracks there run north and south parallel to U.S. Highway 49E. A public gravel road intersects Highway 49 on the east side, crosses the track, then forks into two directions. The Mileston crossing is marked by one railroad crossbuck sign on each side.

¶5. On September 14, 1994, Cox was visiting her mother, Bertha Winters. Winters's home is approximately 125 feet from the Mileston crossing. Testimony at trial showed that Cox backed out of her mother's driveway sometime around 4:00 P.M. and headed west toward the crossing. Testimony also showed that she was going slowly, somewhere between three and ten miles per hour, however, the bulk of the testimony below suggests ten miles per hour is the more appropriate figure.

¶6. Bennett testified that he saw Cox's car when the train was about 300 feet from the crossing and that she appeared to be about 100 feet from the crossing. As the engineer, Bennett sat on the right side of the locomotive closest to Cox's vehicle. Wright, as the conductor, was on the left side of the train, and he estimated that when he saw Cox's car it was approximately 50 to 60 feet from the crossing and that the train was approximately 300 feet from the crossing. Bennett stated that the locomotive's two headlights were on that day. ICR stipulated that the train was traveling between 52 and 54 miles per hour and that the time table for trains in the area was 49 miles per hour.

¶7. Wright testified that Bennett began sounding the train whistle shortly before reaching the whistle post for the Mileston crossing. The post is about 1100 feet from the crossing. Wright stated that Bennett sounded two long whistles, one short whistle, and then another long whistle as they approached the Mileston crossing. Other witnesses at the trial, however, disputed this testimony. Winters claimed that she never heard a whistle at all. Although she stated that she heard the train approaching as she was walking back to her house after seeing Cox off. Marvin Greer stated that he heard the rumble of the train as it approached,

but did not hear a whistle until he saw it hitting the car. Markee Harris, thirteen years old at the time of the accident, stated that he heard the train blow its whistle for the Good Hope Crossing, which is approximately 1.8 miles before the Mileston Crossing. He stated that he did not hear the whistle again until the train came out of the tree line. Harris did note that one can hear the train blow its whistle for the Good Hope crossing all over the Mileston neighborhood.

¶8. Wright stated that when it became apparent that Cox was not going to stop, Bennett sounded the whistle a few times very quickly trying to get the driver's attention. He testified that Bennett began applying the emergency brake about 50 feet from the crossing. Wright further stated that about 50 feet from the crossing he stood up and he saw that Cox was not even looking at the train, but that she was looking north and appeared to be pointing at a passenger in the car. However, Harris, who was on the other side of the tracks from Cox's vehicle and slightly north of the crossing, stated that he saw Cox stop her vehicle and look both ways for a train. Cox's car, however, continued onto the crossing, and the train collided with it. All occupants of the vehicle were killed.

¶9. The two actions, which are the subject of this appeal, were filed claiming that ICR was negligent for failing to properly sound a warning and that for failing to control vegetation along its right of way which resulted in the dangerous obstruction of Cox's view. Following a $10 million verdict in favor of Plaintiffs and the entry of judgment based on that verdict. ICR filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial or in the alternative for a remittitur. Following the trial court's denial of these motions, ICR brought this appeal in this Court.

## STANDARD OF REVIEW

¶10. This Court's standard of review for the denial of a judgment notwithstanding the verdict, peremptory instructions, and directed verdict is as follows:

> [T]his Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.

*Steele v. Inn of Vicksburg, Inc.*, 697 So.2d 373, 376 (Miss.1997). This Court will reverse a trial court's denial of a request for new trial only when the denial amounts to an abuse of discretion. *Id.*

## DISCUSSION

¶11. ICR raises twenty-nine issues on appeal. Those issues include the weight and sufficiency of the evidence, *Batson* problems, numerous evidentiary decisions, failure of the jury to deliberate adequately, a claim that the verdict was excessive, that the punitive damages verdict violates the United States and Mississippi Constitutions, and that the 15% statutory penalty is unconstitutional.

### I. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE PLAINTIFFS TO RECOVER AGAINST ICR BASED ON A CONTENTION THAT THE CROSSING WAS

**EXTRA HAZARDOUS DUE TO VEGETATION, IN GRANTING INSTRUCTIONS P-1 AND P-4, AND IN FAILING TO GRANT D-8A.**

¶12. The trial court granted plaintiffs' requested instructions P-1 and P-4. P-1 reads as follows:

You are instructed that at the time of the collision Lou Bertha Cox was not required by Mississippi law to stop before attempting to cross the tracks if

(1) neither the horn or the bell were sounded beginning at least 900 feet from the crossing, or

(2) the approaching train was not plainly visible and [not] in hazardous proximity.

Instruction P-4 states that

The Court instructs the jury that if you find from a preponderance of the evidence that Illinois Central Railroad Company failed to exercise reasonable care to maintain its right-of-way at the subject crossing with regard to vegetation during the period of time before the accident so that the crossing was not reasonably safe, in that vegetation growing on the railroad right-of-way unreasonably and dangerously obstructed the view by such persons of approaching trains, and if you further find by a preponderance of the evidence that such failure, if any, by Illinois Central was a proximate, contributing cause of the accident, then you must return a verdict for the plaintiffs against Illinois Central Railroad Company.

¶13. ICR's main contention on this issue is that the train was plainly visible. They note that Plaintiffs' own expert, Dr. Gary Long, testified that when a vehicle is 45 feet from the Mileston crossing that a driver can see approximately 746 feet down the track. Based on this contention, ICR requested Instruction D-8A, which is a peremptory instruction. It reads:

You are instructed that LouBertha Cox was negligent as a matter of law by driving onto the crossing when the train was in hazardous proximity to the crossing and was plainly visible.

If you find by a preponderance of the evidence that such negligence was the sole proximate cause of the accident, you shall return a verdict for all of the Defendants.

Plaintiffs argue that the evidence presented made it a jury question as to whether the train was plainly visible, and whether the whistle sounded. Further, since Miss. Code Ann. § 77-9-249, from which Instruction P-1 is taken, is written in the alternative, the jury could find for the Plaintiffs under either theory. Dr. Long further testified that it is recommended that at 70 feet a driver should be able to see 715 feet along a railroad track in order to provide adequate time to see a train, and to stop if necessary. At the Mileston crossing, however, he noted that at 70 feet from the crossing Cox would have only been able to see 385 feet down the track.

¶14. This Court has stated that

Ordinary care requires the railroad company to meet the unusual conditions of a railroad crossing with unusual precautions, particularly where the dangerous condition results from obstructions of view which prevent a traveler from seeing an approaching train until he is dangerously close to the track. *New Orleans & Northeaster R.R. Co. v. Lewis*, 214 Miss. 163, 172, 58 So. 2d 486, 489 (1952)

. The nature of the obstruction and whether one must come dangerously close to the crossing before being able to see the train are factual questions to be resolved by the finder of fact. ***Badger v. Louisville & N.R. Co.***, 414 F.2d 880, 882-83 (5th Cir. 1969)....[I]t has been held that negligence claims against a railroad that permitted the view at a crossing to become obstructed by trees, bushes, weeds and grass were matters for the jury to decide when a vehicle operator would have to proceed to a point of peril upon or dangerously near the railroad company's tracks before obtaining an unimpeded view of a train at an appreciable distance. ***Stacey v. Illinois Cent. R.R.***, 491 F.2d 542, 544 (5th Cir. 1974).

*Clark v. Illinois Cent. R.R.*, 794 So. 2d 191, 194-95 (Miss. 2001).

¶15. In ***Illinois Cent. Gulf R.R. v. Burns***, 396 So. 2d 637, 640 (Miss. 1981), this Court found that a jury verdict against the railroad for negligent maintenance of its right-of-way was against the overwhelming weight of the evidence. In ***Burns***, however, it was noted that there was an unobstructed view for more than 1000 feet. ***Id***. The same can not be said for the Mileston crossing. In ***Mitcham v. Illinois Cent. Gulf R.R.***, 515 So. 2d 852, 853 (Miss. 1987), a jury verdict in favor of the railroad was affirmed when the facts presented that a driver 15 feet from a crossing could see approximately 1,955 feet down the track. Of course, in that case there was no dispute regarding the whistle sounding. ***Id***. Dr. Long testified that Cox was traveling at approximately 14.667 feet per second. As she had about 125 feet to travel to reach the crossing, she would have arrived at the crossing approximately 8 seconds after leaving her mother's home.[1] Dr. Long testified that the train was traveling at approximately 78 feet per second, which would mean under the laws of physics that it would have had to have been about 664 feet from the crossing when Cox began traveling.[2] If these approximations are true, then when Cox was 70 feet from the tracks, she would have been able to see 385 feet down the track and the train would have only been 373 feet away.[3] This is supported by the testimony of both Bennett and Wright. Considering these figures, Cox should have seen the train and had the appropriate time to react even under Dr. Long's recommended numbers. However, Dr. Long testified that Cox only had about 3.8 seconds to react and that this was not enough.

¶16. Under the case law of this Court, however, whether Cox's sight was obstructed in an unreasonable manner was a fact question for the jury. Considering the amount of deference given to a jury's verdict, and the fact that conflicting evidence was presented regarding the issue of visibility and whether the whistle sounded, this Court finds no error in the giving of these instructions. Therefore, Instruction D-8A was appropriately denied as it can not be said as a matter of law that Cox was negligent when the issue of whether the train was "plainly visible" is to be a fact question for the jury. Further, while Instruction P-1 arguably might be somewhat misleading as drafted, it does not rise to the level of reversible error in this case, and Instruction P-4 is a correct statement of prior case law announced by this Court.

> **II. WHETHER THE DEGREE OF NEGLIGENCE ATTRIBUTED TO COX IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

¶17. ICR relies on the arguments presented under Issue I to support this claim, and offers nothing new. This Court finds that while another jury may have found Cox more at fault liable, the fact that this jury found her only 5% at fault liable is not against the overwhelming weight of the evidence.

> **III. WHETHER THE TRIAL COURT ERRED IN ALLOWING A PUNITIVE DAMAGES CLAIM TO PROCEED TO THE JURY, IN GRANTING INSTRUCTION NO. 1,[4] AND IN FAILING TO GRANT D-33.[5]**

¶18. The trial court made the following findings in determining whether the issue of punitive damages should go to the jury:

> The Court finds that there was vegetation at the crossing, and, based on the jury's verdict of 85 percent fault to Illinois Central, the Court finds that the vegetation contributed heavily to the cause of the accident.

> The Court finds further that Illinois Central had knowledge of such vegetation; that the evidence is that the tree line was about 300 to 350 feet from the crossing, and, as a result of such vegetation, only gave a motorist about four seconds to see a train and to react.

> The engineer testified that the tree line, because of the tree line, he was only able to see the motorist at least 100 feet from the crossing.[6] And all the employees that testified appeared to have had such knowledge of the reaction time for motorists, as well as for the engineer, in recognizing a train or a motorist at the crossing. Therefore, this Court finds that the condition of vegetation at the crossing that obstructs the motorist's view of a train and a train's view of a motorist that resulted in a motorist having four seconds to react to a train and an engineer having 100 feet to react to a motorist[7] amounts to a wanton and willful disregard for safety of others at the crossing, and therefore, finds that there is a question for the jury as to whether or not the actions of Illinois Central constituted gross negligence. Therefore, this Court will present the issue of punitive damages to the jury.

¶19. This Court has repeatedly held that "[i]n order to recover punitive damages under Mississippi law, there must be some element of aggression or some coloring of insult reflecting malice, gross negligence, or ruthless disregard for the rights of others." ***Ill. Cent. R.R. v. White***, 610 So.2d 308, 320 (Miss. 1992) (citations omitted). Plaintiffs contend that ICR had no policy regarding vegetation control and that, in an attempt to cut costs ICR was willing to risk the lives of motorists. ICR, however, did have a policy regarding vegetation, albeit a non-specific one. Railroad employees testified that the vegetation policy was a common sense policy. Track supervisor Dean Hopson testified that large trees were cut as needed, the railroad sprayed for brush control for the trees every other year and twice a year the spray train goes through for vegetation. William Meador, the Engineering Superintendent for the Gulf Region of ICR, stated that the general policy was to maintain a sight distance at crossings in order to ensure that any reasonably careful driver could see a train coming in time to stop prior to attempting to cross.

¶20. The testimony elicited in the first portion of the trial demonstrated nothing more egregious than the lack of numerical guidelines and/or the use of sight distance tables in determining how much vegetation to cut back. There was no evidence that anyone ignored ICR's vegetation policy. This Court does not find that this was willful, egregious behavior. At worst, if the jury's verdict in the actual damages phase of the trial is interpreted as a finding that the vegetation had been negligently maintained, then someone did not cut as well as they should have. This Court finds that the conduct involved here did not rise to the level which would warrant punitive damages. Thus, the award of punitive damages must be reversed and rendered.

### IV. WHETHER THE TRIAL COURT ERRED IN ALLOWING TESTIMONY CONCERNING A LACK OF A NUMERICAL POLICY ON VEGETATION AND ERRED IN FAILING TO GRANT JURY INSTRUCTION D-23A.

¶21. The trial court noted while determining which jury instructions would be allowed during the punitive

damages phase that Plaintiffs would not be allowed to submit an instruction that stated ICR could be liable for punitive damages because of a failure to have a corporate policy as "there [was] no evidence and there is no law that says they have to have a corporate policy." The standard of review regarding the admission or exclusion of evidence is abuse of discretion. *Tatum v. Barrentine*, 797 So.2d 223, 230 (Miss.2001) (citing *Thompson Mach. Commerce Corp. v. Wallace*, 687 So.2d 149, 152 (Miss.1997)). The information regarding corporate policy could have been relevant to the question of punitive damages, in that a corporate policy not to cut back trees might warrant such damages. Thus, it was not error to allow this testimony.

¶22. Instruction D-23A stated that the jury "may not find against [ICR] based on any claim that [ICR] should have instituted some other numerical document or policy on vegetation control." While we find that this instruction would have been appropriate to give, as the testimony had elicited a lack of a numerical policy, the denial of this instruction does not amount to reversible error.

### V. WHETHER THE TRIAL COURT ERRED IN FAILING TO DIRECT A VERDICT ON WINTERS'S CLAIM FOR EMOTIONAL DISTRESS AND ERRED IN GRANTING INSTRUCTION P-9.

¶23. Instruction P-9 informed the jury as follows:

Should your verdict be for [Winters] in her claim for negligent infliction of emotional distress, you may consider the following factors in determining the amount of damages to be awarded to her as may be shown by a preponderance of the evidence to have been incurred as a result of her witnessing the collision:

(1) mental anxiety and emotional distress.

This instruction is a correct statement of law, and thus this Court finds that it was not error to grant it.

¶24. ICR's main contention under this issue is that it should have been granted a directed verdict on Winters's claim. First, ICR claims that it is not clear that Winters actually witnessed the accident. Second, ICR asserts that even if she witnessed the accident she did not put forth evidence to support a verdict for mental or emotional distress. As to ICR's first contention, Winters testified at trial, as follows:

And then I heard a train coming. I was fixing to go on back in the house. I heard a train coming. It was coming fast, and I said, "I know Tiny [apparently a nickname for Cox] got down off that track."...And I backed up and looked. I could see a car still up there, looked like. The sun was going over...And I can't see all that too good, but I could see that car...I hollered, I said, "Get down, Baby. Get down. Get down." And I run on out to the road and the train kept by, and I heard something hit. I ran up there to see. I thought it knocked it to the side. I ran up where it stopped. I ran up under it. I got to the other side-I crawled under [the train]. And I got to the other side. I didn't see the car. And I just stood up on the highway and somebody picked me up and took me down there and said that the train was up on the, the car was up on the train...

¶25. This Court has stated three criteria required to qualify as a bystander who is owed a duty of care:

(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff

from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Summers v. St. Andrew's Episcopal Sch., Inc.*, 759 So. 2d 1203, 1210 (Miss. 2000) (citations omitted). We find that Winters's testimony was sufficient to support a jury finding that she did view the accident and that she meets the above requirements to qualify as a bystander.

¶26. As to ICR's second contention, this Court has repeatedly discussed the issue of what proof is needed to support a claim for mental or emotional distress. We have held that "[m]ental anguish is a nebulous concept...and requires substantial proof for recovery." *Id*. at 1211 (citing *Morrison v. Means*, 680 So. 2d 803, 805 (Miss. 1996)). Further, "[i]f the case [is] one of ordinary garden variety negligence, the plaintiffs would have to prove some sort of injury, whether it be physical or mental. If the conduct was not malicious, intentional or outrageous, there must be some sort of demonstrative harm..." *Id*. We find that this case is one of ordinary negligence, and thus the only question presented is whether Winters presented "substantial proof" of a demonstrable harm. Only a small portion of Winters's testimony goes beyond testifying about what her daughter meant to her, and appears to go directly to mental distress. In response to the question of how this accident has affected her life, Winters stated:

> It did me so bad, I couldn't sleep at night, and I had nightmares. I'd lay down, try to go to sleep, I'd have nightmares, and I'd get up, sit up all through the night.

Winters further testified that she had seen a psychiatrist in Jackson three times, but had to discontinue this as she did not have a way to get there. The testimony regarding this was as follows:

> Attorney: Well, did you see any physicians?
>
> Winters: Yeah, I went to a -- I went down to Jackson three times to see them doctors, but -
>
> Attorney: What kind of doctors was it you saw?
>
> Winters: It was -- uh -- it was -- one of them psychiatric doctors. I don't know that they was.

¶27. This Court has stated repeatedly that testimony regarding sleeplessness and nightmares is insufficient to support an instruction or award of damages for emotional distress. *Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 744 (Miss. 1999); *Morrison*, 680 So. 2d at 807; *Strickland v. Rossini*, 589 So. 2d 1268, 1275-76 (Miss. 1991). Winters's only addition to her insufficient testimony regarding nightmares and sleeplessness is that she went to an unnamed doctor in Jackson three times. We find that such vague testimony regarding visits to the psychiatrist cannot support a damage award for emotional distress, particularly one of $1.5 million. We simply affirm our previous case law, which has repeatedly held substantial proof is required when the behavior at issue is not outrageous conduct. Winters failed to offer substantive proof. Therefore, the judgment for Winters must be reversed and rendered.

### VI. WHETHER THE TRIAL COURT ERRED IN FAILING TO REMOVE A JUROR AND ERRED IN FAILING TO DECLARE A MISTRIAL AS A RESULT OF IMPROPER CONTACT BETWEEN THE JUROR AND THE PLAINTIFFS.

¶28. During the course of the trial, ICR representatives observed two jurors sitting outside with Winters and

her brother, who testified at the trial. They observed at least one juror actually speaking to Winters. This was reported to the judge, who then spoke individually with the two jurors, and later played a recording of these conversations for the Plaintiffs and Defendants. As a result of this activity, the trial judge dismissed the juror who admitted having a conversation with Winters and replaced her with the one remaining alternate. The other juror stated that she had gone outside waiting for someone to pick her up after trial that day. She sat on the benches in front of the courthouse and noted that Winters and another juror were over there speaking to one another. She stated that she did not speak with them because she remembered the judge's initial admonition not to speak to those involved in the case, however she told the judge that she did not realize that meant that she could not sit in the same area with them. The judge determined that the second juror's ability to make a decision did not appear to be subject to influence from the events that transpired. There was a suggestion by Plaintiffs' counsel that they would be willing to proceed with only 11 jurors, if Defendants would be amenable, however Defendants did not want to proceed with only 11 jurors. Defendants claim that the trial judge erred in failing to dismiss the second juror and in failing to grant a mistrial. They claim this was particularly prejudicial to them as the juror that was not dismissed served as foreperson during both phases of the trial.

¶29. *Atwood v. Lever,* 274 So. 2d 146 (Miss. 1973), dealt with a juror approaching the plaintiff and paying her a compliment. This Court affirmed the trial court's denial of a mistrial stating that "[a] mistrial or a new trial should not be granted on this ground in a civil case, unless the circumstances indicate some prejudice, wrongful intent, or unfairness." *Middleton v. Evers*, 515 So. 2d 940, 943 (Miss. 1987) (citing *Atwood*, 274 So. 2d at 147. As this Court has noted,

> A trial judge is in a better position to assess the effect of incidents which may require a mistrial than is this Court on appeal, and this Court will not reverse on the failure to grant a mistrial unless the trial judge abused his discretion in overruling the motion for a mistrial.

*Cavett v. State*, 717 So. 2d 722, 729 (Miss. 1998) (quoting *Bredemeier v. Jackson*, 689 So. 2d 770, 774 (Miss. 1997)). Further, this Court also "presume[s] that jurors follow the instructions of the court. To presume otherwise would be to render the jury system inoperable." *Chase v. State*, 645 So. 2d 829, 853 (Miss. 1994) (quoting *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985)).

¶30. Following these presumptions and the facts presented below, we find that the trial court did not err in allowing the second juror to remain on the jury, nor did it err in refusing to grant a mistrial.

## VII. WHETHER THE TRIAL COURT ERRED IN FAILING TO EXCUSE POTENTIAL JURORS FOR CAUSE.

¶31. ICR contends that three jurors should have been excused for cause based on their relationships with Plaintiffs or Plaintiffs' counsel among other reasons.[8] This Court approaches such contentions under the following guidelines:

> A circuit judge has wide discretion in determining whether to excuse any prospective juror, including one challenged for cause. The circuit judge has an absolute duty, however, to see that the jury selected to try any case is fair, impartial and competent. 'Trial judges must scrupulously guard the impartiality of the jury and take corrective measures to insure and unbiased jury.

*Brown v. Blackwood*, 697 So. 2d 763, 769 (Miss. 1997) (citations omitted).

¶32. Additionally, it is a generally accepted principle that "jurors take their oaths and responsibilities seriously, and when a prospective juror assures the court that, despite the circumstance that raises some question as to his qualification, this will not affect his verdict, this promise is entitled to considerable deference."*Scott v. Ball*, 595 So. 2d 848, 850 (Miss. 1992) (citations omitted). These three jurors each assured the trial court that their ability to be fair to both parties would not be affected. This Court has stated that "[a] person is not incompetent as a juror merely because he knows, or is a neighbor, or an intimate acquaintance, of, or on friendly relations with, one of the parties, or members of his family." *Harding v. Estate of Harding*, 185 So. 2d 452, 456 (Miss. 1966) (citation omitted).

¶33. ICR used its four peremptory challenges for two of these three jurors, and used its remaining two on jurors whom it did not challenge for cause. This Court has "consistently held that the trial court may not be put in error for refusal to excuse jurors challenged for cause when the complaining party chooses not to exhaust his peremptory challenges." *Scott v. Ball*, 595 So. 2d 848, 851 (Miss. 1992) (citations omitted).

¶34. We find that the trial court did not err in refusing to remove these jurors for cause, and further that ICR is not permitted to raise this issue on appeal as it chose not to exhaust its peremptory challenges on the jurors it claims should have been excused for cause.

### VIII. WHETHER THE TRIAL COURT ERRED IN FAILING TO SUSTAIN DEFENDANTS' *BATSON* CHALLENGE OF PLAINTIFFS' USE OF PEREMPTORY CHALLENGES TO REMOVE WHITE JURORS.

¶35. ICR maintains that Plaintiffs' use of its peremptory challenges to remove three of the four white members of the jury pool was discriminatory in violation of *Batson*. The remaining white juror was the juror that ICR had attempted to remove for cause due to his bank's relationship with Plaintiffs' counsel. Plaintiffs proffered its reasoning for these three strikes. Plaintiffs explained that Juror No. 38's spouse was the town clerk in an area where defense counsel has a high level of influence. Juror No. 48's spouse was a bookkeeper, and due to the fact that the case would involve numerous figures, counsel was afraid the juror might consult his spouse. Finally, Juror No. 16 walks daily on the same street where one of the attorneys for the Plaintiffs walks, and she does not wave at him when he waves at her. ICR maintains that these reasons are pretextual, and that its *Batson* challenge to these strikes should have been sustained.

¶36. This Court has stated that:

> We give great deference to the trial court's findings of whether or not a peremptory challenge was race-neutral.... Such deference is necessary because finding that a striking party engaged in discrimination is largely a factual finding and thus should be accorded appropriate deference on appeal.... Indeed, we will not overrule a trial court on a Batson ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence....

*Thorson v. State*, 721 So.2d 590, 593 (Miss.1998). This Court has noted that a party seeking to strike a prospective juror is not required to supply "an explanation that is persuasive, or even plausible." *Randall v. State*, 716 So. 2d 584, 588 (Miss. 1998). ICR did not attempt to rebut these explanations, and as this Court has stated, "where defense counsel does not rebut the race-neutral reasons offered...,'the trial judge may base his decision only on the reasons given...'" *Woodward v. State*, 726 So. 2d 524, 533 (Miss. 1997). Also, "[i]n the absence of an actual proffer of evidence by the defendant to rebut the...neutral explanations, this Court may not reverse on this point." *Sudduth v. State*, 562 So. 2d 67, 71 (Miss. 1990)

.

¶37. We find that ICR's failure to challenge these reasons below bars them from complaining of the issue on appeal.

## IX. WHETHER THE TRIAL COURT ERRED IN ALLOWING WITNESS WILLIAMS TO RENDER EXPERT OPINION TESTIMONY.

¶38. ICR argues that the trial court erred in allowing J.B. Williams, Jr. to render expert testimony when the opinions he proffered were not listed during pre-trial discovery. The Plaintiff's Designation of Experts states that:

> Mr. Williams made a plat and profile of the subject crossing in 1991, in connection with another fatal train-vehicle crash. The roadway was unchanged between the date of the survey and the date of the subject collision. Plaintiffs intend to call Mr. Williams simply to explain what is depicted on the plat, in the event that counsel cannot agree to some reasonable stipulation thereasto. A copy of this plat was supplied to defense counsel herein in connection with the other case in 1991.

Williams, who is a civil engineer, testified as to the slope of the Mileston crossing. He stated that it was 6.9%, and that it should have been 5% or less. This Court has noted that our rules regarding expert testimony require "the substance of every fact and every opinion which supports or defends the party's claim or defense must be disclosed and set forth in meaningful information which will enable the opposing side to meet it at trial." *Nichols v. Tubb*, 609 So. 2d 377, 384 (Miss. 1992).

¶39. Despite this rule, we find that any error here was harmless as another of Plaintiffs' experts, James Loumiet, testified regarding the slope of the crossing and his opinion was listed in detail during pre-trial discovery.

## X. WHETHER THE DEFENDANTS WERE UNFAIRLY PREJUDICED BY THE PLAINTIFFS' INTRODUCTION OF VOLUMINOUS TESTIMONY CONCERNING THE SLOPE OF THE COUNTY ROAD LEADING TO THE CROSSING AND THE TRIAL COURT ERRED IN FAILING TO GRANT INSTRUCTION D-9.

¶40. Three experts and several lay witnesses mentioned that the Mileston crossing was a "hump back" crossing. ICR contends that this testimony should not have been admitted. Further, to prevent the jury from finding negligence based on this testimony, ICR submitted Jury Instruction D-9. D-9 instructed that the jury could "not find Illinois Central or any Defendant negligent based on the slope or grade or elevation of the county road leading up to the tracks." Plaintiffs contend that this testimony was relevant to demonstrate the overall danger involved at this crossing. As noted previously "[t]he standard of review regarding the admission or exclusion of evidence is abuse of discretion." *Tatum v. Barrentine*, 797 So.2d at 230 (citing *Thompson Mach. Commerce Corp. v. Wallace*, 687 So.2d at 152).

¶41. This Court finds that the trial court did not abuse its discretion in allowing this testimony. The only issues submitted to the jury were the questions of liability regarding the growth of vegetation and failure to give adequate warning. Further, as to the denial of Instruction D-9, ICR is barred from complaining about this on appeal. The trial court offered to allow Instruction D-9, but noted that it felt that standing alone that it was a misleading instruction. She informed ICR that if they would combine D-9 with another instruction she would submit it to the jury, and ICR refused. We find that this is akin to invited error.

## XI. WHETHER THE TRIAL COURT ERRED IN FAILING TO MODIFY JURY INSTRUCTION P-3, AND ERRED IN MODIFYING INSTRUCTIONS D-22 AND D-23.

¶42. ICR contends that these instructions should have informed the jury that rather than just exercising reasonable care so that the crossing would be reasonably safe, they should have stated "so that the crossing would be reasonably safe for persons exercising reasonable care for their own safety." They cite to several cases that have utilized this standard. *Spillman v. Gulf & S.I.R. Co.*, 173 Miss. 725, 163 So. 445 (1935); *Gulf R.R. v. Simmons*, 150 Miss. 506, 117 So. 345 (1928); *McComb v. Hayman*, 124 Miss. 525, 87 So. 11 (1921).

¶43. *Alabama & V. R. v. Graham*, 171 Miss. 695, 157 So. 241 (1934), recognized the authority cited by ICR noting a duty to reasonably careful motorists, but went on to state that "it does not necessarily follow that there can be no liability to a person who was not exercising care." Further, Miss. Code Ann. § 77-9-249(3) concludes that a motorist's violation of any part of § 77-9-249(1) "shall not of itself defeat recovery, and the question of negligence or the violation aforesaid shall be left to the jury." Thus, it recognizes that a negligent plaintiff is still owed a duty.

¶44. Under our recent case law, it was not improper for the trial court to refuse to instruct the jury in that manner. *See Alabama Great Southern R.R. Co v. Lee*, 2002 WL 938127 (Miss. 2002). This case found that it was not error for the trial court to refuse to grant a negligence per se instruction as Miss. Code Ann. § 77-9-249 makes a violation of the statute strictly a jury question. *Id*. at *4. Following this reasoning, to give the instruction in the manner requested by ICR might have given the impression that they do not have a duty to negligent motorists. Thus, this allegation of error is without merit. This Court, however, finds that it would not have been improper for the trial court to have given the instructions as requested by ICR.

## XII. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT PROPOSED INSTRUCTION D-3,[(9)] IN FAILING TO DIRECT A VERDICT IN FAVOR OF WRIGHT, AND IN GRANTING INSTRUCTION P-7.

¶45. Instruction P-7 reads as follows:

> The Court instructs the jury that if you believe from a preponderance of the evidence that the train crew failed to sound a reasonably adequate audible warning of the train's approach to the crossing in Mileston, by failing to blow the horn or ringing the bell beginning at least 900 feet from the crossing, and that such failure, if any, was a proximate, contributing cause of the accident, then you must return a verdict for the plaintiffs.

ICR and Wright contend that he should not have been held liable in his position as conductor. Plaintiffs assert two theories of liability in the present case, negligent maintenance of vegetation on the railroad's right-of-way and failure to adequately sound a warning. The engineer is responsible for the sounding of the horn. Plaintiffs cite to ICR's own operating rules, which they did not submit during the trial, but which they ask this Court to take judicial notice of under Miss. R. Evid. 201. These rules note that the conductor and the engineer are equally responsible for the safety of the train and the observance of rules. This Court notes that common sense dictates that the conductor is riding in the same locomotive and is aware of the rules the train must follow.

¶46. Thus, we find that the trial court did not err in denying a directed verdict to Wright based on this

reasoning.

### XIII. WHETHER THE DEGREE OF NEGLIGENCE ATTRIBUTED TO BENNETT AND WRIGHT WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶47. At trial, Bennett and Wright testified that Bennett sounded the whistle according to the requirements under the law. In fact, Wright noted that Bennett began sounding the whistle prior to the whistle post, which was actually 1100 feet from the crossing, rather than the 900 feet required by statute. Winters is the only witness who testified that she did not ever hear a whistle. Greer testified that he did not hear it until he saw the train hitting the car. Greer, however, noted that he was not listening for the whistle. Harris testified that he heard the whistle, but stated that it was the whistle for the Good Hope crossing. This testimony fails under a basic consideration of the laws of physics. The Good Hope crossing was 1.7 miles away. He stated that he first heard the whistle as Cox was pulling out of her mother's driveway. This would mean that the train traveled 1.7 miles in the same amount of time that Cox traveled 125 feet-a physical impossibility knowing the approximate speed that both were traveling. Harris did contradict himself later in redirect and testified that Cox was inside the house when he heard the whistle for the Good Hope crossing. Thus, Harris's testimony is questionable, although according to him the whistle did sound.

¶48. The contradictory testimony presented below on this issue is enough to make this a jury question, and thus this allegation is without merit.

### XIV. WHETHER THE JURY FAILED TO DELIBERATE AS REQUIRED BY LAW.

¶49. ICR argues that the jury deliberated only 56 minutes before returning a verdict for actual damages in the amount of $4.8 million. It states that after only 11 to 12 minutes the jury sent out a note, which indicated that they had completed any consideration of liability issues. It asserts that this short length of time evidences bias, passion and prejudice by the jury. This Court has recently been very clear on this issue, and stated:

> [O]ur case law is well settled that short deliberations do not automatically evidence bias or prejudice. *See Gray v. State*, 728 So.2d 36 (Miss.1998) (upholding a seven minute jury verdict); *Smith v. State*, 569 So.2d 1203 (Miss.1990) (upholding a three minute jury verdict); and *Johnson v. State*, 252 So.2d 221 (Miss.1971) (upholding ten minute jury verdict). We have held that "[t]here is no yardstick of time which a jury should use before reaching a verdict." *Johnson*, 252 So.2d at 224. Also, we have developed "no formula" for calculating the length jury deliberations should last. *Smith*, 569 So.2d at 1204.

*Ekornes-Duncan v. Rankin Med. Ctr.*, 808 So.2d 955, 962 (Miss. 2002). This issue is without merit.

### XV. WHETHER THE AMOUNT AWARDED TO DEMETRIUS HAWKINS WAS SO EXCESSIVE AS TO EVIDENCE BIAS, PASSION AND/OR PREJUDICE.

¶50. ICR contends that the award of $3 million to Demetrius is excessive. It cites to case law, which indicates one can gauge excessiveness by comparing the damages and the award. *See Jackson v. Ainsworth*, 462 So. 2d 325, 328 (Miss. 1984). It then cites to Cox's lack of employment and low wage earning potential as the damages. It ignores the fact that this Court allows recovery for "the loss of the companionship and society of the decedent." *Estate of Jones v. Howell*, 687 So. 2d 1171, 1178 (Miss. 1996).

¶51. This Court has detailed the standard of review to be utilized in determining whether a jury verdict is excessive in a particular case:

> The damages, therefore, must be so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable, and outrageous, and such as manifestly show the Jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, where they have no standard by which to ascertain the excess. ***Wells Fargo Armored Serv. Corp. v. Turner***, 543 So.2d 154, 158 (Miss.1989)(citing ***Detroit Marine Eng'g v. McRee***, 510 So.2d 462 (Miss.1987)). However, this Court has held that a jury verdict cannot be disturbed simply because the amount of damages seems to be either "too high" or "too low." ***C & C Trucking Co. v. Smith***, 612 So.2d at 1106.

*Alpha Gulf Coast, Inc. v. Jackson*, 801 So.2d 709, 724-25 (Miss. 2001). We find that the damages awarded to Demetrius as the sole beneficiary of his mother may appear high, but we do not find that it is an outrageous award. Thus, this allegation of error is without merit.

### XVI. WHETHER THE TRIAL COURT ERRED IN ALLOWING PLAINTIFFS TO QUESTION ENGINEER BENNETT ABOUT BLOWING THE HORN ON OTHER OCCASIONS AT OTHER CROSSINGS AND ERRED IN ADMITTING EVIDENCE PERTAINING TO OTHER CROSSINGS, AND IN FAILING TO GRANT A MISTRIAL.

¶52. ICR makes two main arguments under this issue. First, it argues that the questioning of Bennett regarding other crossings was error. Second, it alleges that the mention of a study completed by Dr. Gary Long entitled "Grade Crossing Safety in Holmes County, Mississippi" was error.

¶53. As to the first contention, we find that the trial court did not commit any error. Plaintiffs' counsel first asked if Bennett had ever failed to properly blow his horn during his long career as an engineer and Bennett responded in the negative. ICR then objected and the objection was sustained. Plaintiffs' counsel later asked Bennett if he had ever been involved in any other collisions. ICR objected, and again the objection was sustained. Both times ICR requested that the trial court instruct the jury to disregard the questions and the first answer, and the trial court refused. At the beginning of trial, the trial judge instructed the jury that if she sustained an objection then they should disregard any answer given. Thus, making the assumption that the jury follows the instructions it is given, this Court determines that the answer was disregarded by the jury.

¶54. Following this, ICR moved for a mistrial stating that the questions left the jury with a strong implication that Bennett had been involved previously in an accident, and this was an incurable prejudice. The trial court denied this motion. This Court has found that "[w]hether to grant a motion for mistrial is within the sound discretion of the trial court. The standard of review for denial of a motion for mistrial is abuse of discretion." *Pulphus v. State*, 782 So.2d 1220, 1222 (Miss.2001) (citations omitted). The denial of a mistrial under these circumstances was not an abuse of the trial judge's discretion. The objections were sustained, and no testimony came in at all regarding other collisions involving Bennett.

¶55. As to ICR's second contention, this Court has stated that "for a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party."***Terrain Enters., Inc. v. Mockbee***, 654 So. 2d 1122, 1131 (Miss. 1995). ICR overstates this

issue slightly when it states that Plaintiffs were allowed to exhibit Dr. Long's study to the jury. In actuality, when Tom Martin, an investigator for ICR, was on the stand Plaintiffs showed him the study and asked him if he had ever seen it before. It is expressly stated in the record that the jury was not shown the study. Thus, we find that there is no prejudice which would require reversal on this issue.

¶56. ICR makes an additional contention regarding an ethical problem with this study, as the study had been prepared during prior litigation and Plaintiffs' counsel sent a copy of the study to Martin in 1991 despite the fact that ICR was represented by counsel. First, this allegation would be more appropriately considered in a complaint to the Mississippi Bar and not before this Court. Further, the earlier sending did not involve the present plaintiffs and it would be unfair to limit evidence that they could present based on the identity of their counsel.

### XVII. WHETHER THE COURT ERRED IN DENYING DEFENDANTS' MOTION FOR PROTECTIVE ORDER AND ERRED IN ALLOWING THE TAKING AND USE OF THE DEPOSITION OF THE FORMER CEO OF ICR.

¶57. On an earlier appeal in this matter, this Court addressed the issue of whether it was error for the trial court to depose the CEO. This Court stated that

> [u]nder the heirs' two theories for punitive damages, the testimony of the executives is relevant to their claims and appear reasonably calculated to lead to admissible evidence. Thus, the circuit court did not abuse its discretion in concluding that the executives could be deposed.

*Illinois Cent. R.R. v. Winters*, 815 So.2d 1168, 1178-79 (Miss. 2002). Under this issue, ICR makes no argument as to why the deposition should not have been used. Therefore, this Court is not under any obligation to review this issue. *See In re Estate of Mason*, 616 So. 2d 322, 327 (Miss. 1993); *Zimmerman v. Three Rivers Planning & Dev. Dist.*, 747 So.2d 853, 861 (Miss. Ct. App. 1999).

### XVIII. WHETHER THE COURT ERRED IN DENYING DEFENDANTS MOTION IN LIMINE AND ERRED IN ALLOWING LONG AND PLAINTIFFS' OTHER OPINION WITNESSES TO TESTIFY REGARDING SIGHT DISTANCE TABLES AND NON-RECOVERY ZONES.

¶58. ICR contends that allowing this testimony is contrary to Mississippi law which requires a driver to approach a railroad crossing at a speed prepared to stop. For this proposition ICR cites *Mitcham v. Illinois Cent. Gulf R.R.*, 515 So. 2d 852, 855 (Miss. 1987). which states that under § 77-9-249 "a motorist must take such measures as will allow him to come to a stop not less than fifteen (15) feet from the nearest rail, and not proceed until he can do so safely." This does not, however, conclude that testimony regarding sight distance and non-recovery zones is not in tune with this law. In fact, the testimony regarding sight distance and non-recovery zones appeared to be methods of demonstrating the dangers attributed to a particular crossing. As Dr. Long testified, a driver who sees a train 715 feet away while still 70 feet from the crossing has ample time to stop. Further, § 77-9-249 only instructs that a motorist has a duty to stop between 50 and 15 feet from the crossing when certain factors are present. Further, this Court has referred to sight distance in numerous opinions regarding railroad-vehicle collision cases. *Ala. Great S. R.R. v. Lee*, 2002 WL 938127 (Miss. 2002); *Clark v. Ill. Cent. R.R.*, 794 So.2d 191 (Miss. 2001); *Kansas City S. Ry. v. Johnson*, 798 So.2d 374 (Miss. 2001); *Ill. Cent. R.R. v. White*, 610 So.2d 308 (Miss. 1992).

¶59. This allegation of error is without merit.

### XIX. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION IN LIMINE AND IN ALLOWING TESTIMONY FROM CHANNELL CONCERNING THE LOSS OF FUTURE WAGES ATTRIBUTABLE TO COX.

¶60. ICR contends that David Channell's testimony regarding Cox's future wages was incorrect and based on inaccurate information. This Court has stated that "there is no exact yardstick for [determining] such damages." *Bush Constr. Co. v. Walters*, 251 Miss. 384, 394, 64 So. 2d 900, 903 (1964). Channell based his figures on making some assumptions regarding Cox's wage-earning capacity. He had been informed that Cox had only worked at minimum wage jobs, and so he estimated that her lifetime earnings would be $108,899.

¶61. ICR makes no arguments why his figures are wrong other than referring to other testimony regarding Cox's sporadic work history and mental problems. This Court finds that this other testimony addresses the problem ICR sees with Channell's figures, in that it rebuts his conclusion that she would have had a permanent minimum wage job. As this Court has stated, "[w]hen evidence is in conflict, the jury is the sole judge of both the credibility of a witness and the weight of his testimony." *Weathersby Chevrolet Co. v. Redd Pest Control Co.*, 778 So.2d 130, 133 (Miss. 2001). Thus, this was a fact issue lying in the province of the jury, and we find no abuse of discretion in allowing this testimony.

### XX. WHETHER THE TRIAL COURT ERRED BY ALLOWING PLAINTIFFS TO USE CERTAIN EXHIBITS.

¶62. In this allegation of error, ICR argues that five exhibits should not have been admitted. They cite no authority for these arguments other than for one exhibit citing to the argument found under Issue XVIII. This Court is under no obligation to review assignments of error unsupported by argument or citation to authority. *Pate v. State*, 419 So. 2d 1324, 1325-26 (Miss. 1982). Nonetheless, we will quickly address these exhibits, keeping in mind that "[t]he standard of review regarding the admission or exclusion of evidence is abuse of discretion. *Tatum v. Barrentine*, 797 So.2d at 230 (citing *Thompson Mach. Commerce Corp. v. Wallace*, 687 So.2d at 152.

¶63. First, ICR contends that P-51 and P-53 should not have been admitted. These two exhibits are photographs taken of the crossing on the day of the accident. These photographs were authenticated as taken at the scene, so this Court can not fathom why they would not be admitted. It is true that there is a sun glare in the photos which makes it difficult to view the subject of the photograph, however ICR presented other photographs of the same scene from the day of the accident. Additionally, ICR noted the differences through various witnesses' testimony of these photographs. Thus, if there was any error in allowing these photographs, it is harmless due to ICR's photographs and cross-examination regarding the differences.

¶64. Second, ICR contends that P-65, a video taken by the Plaintiffs on the day of the accident, should not have been admitted for the same reason. Again, there was no error in the admission of this evidence.

¶65. Third, ICR argues that P-101, P-102 and P-103, all of which relate to Dr. Long's "concepts of sight distance and non-recovery zones," should not have been admitted for the reasons they argue under Issue XVIII. As this Court found no merit to their allegations under that Issue, this issue is meritless based on the

same grounds.

### XXI. WHETHER THE TRIAL COURT ERRED BY ALLOWING THE PLAINTIFFS TO PLAY PORTIONS OF THE DEPOSITION OF ICR'S FORMER CEO DURING THE ACTUAL DAMAGE PHASE OF THE TRIAL.

¶66. ICR simply states that because its former CEO, Harrison testified that others were more knowledgeable on areas of policy relating to the issues in this case and that he was not a witness to any phase of the accident that his deposition should not have been used. They cite no authority for this other than the argument discussed above under Issue XVII. Harrison's deposition was used to point out that ICR had no numerical policy regarding vegetation clearance. As the admission of evidence is only subject to an abuse of discretion review, there is no support for an argument that admission of this testimony was an abuse of the trial court's discretion.

### XXII. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE PLAINTIFFS TO CALL ICR EMPLOYEES CECIL COKER AND JOHN KAY.

¶67. Cecil Coker is an assistant track supervisor, who was the track supervisor over the Mileston crossing for 1996-98. John Kay was not employed by ICR during the period of 1994. Kay is currently ICR's General Manager of its Gulf Division, which includes the Mileston crossing. Coker testified during the actual damages phase, and Kay testified during the punitive damages phase. As we have found that the punitive damages issue should not have gone to the jury, we must only review whether it was error to allow Coker's testimony.

¶68. Again, admission of testimony is subject only to an abuse of discretion review. *Tatum v. Barrentine*, 797 So.2d at 230 (citing *Thompson Mach. Commerce Corp. v. Wallace*, 687 So.2d at 152). Coker was called merely to testify as to the policies regarding vegetation control. Those policies had not changed from 1994 to the present, and thus he were not called upon a subject of which he was ignorant. We find no error in allowing this testimony.

### XXIII. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE PLAINTIFFS TO USE OUT-OF-DATE FINIACIAL INFORMATION CONCERNING ICR AND IN ALLOWING PLAINTIFFS TO REFER TO THE FINANCIAL POSITION OF CANADIAN NATIONAL.

### XXIV. WHETHER THE TRIAL COURT ERRED IN ALLOWING PORTIONS OF THE VIDEO DEPOSITION OF ICR'S FORMER CEO TO BE PLAYED DURING CLOSING ARGUMENT OF THE PUNITIVE DAMAGES PHASE.

### XXV. WHETHER THE TRIAL COURT ERRED IN ALLOWING REFERENCE TO OTHER CROSSINGS DURING THE PUNITIVE DAMAGES PHASE AND ERRED IN ALLOWING THE USE OF EXHIBIT P-80.

### XXVI. WHETHER THE JURY DID NOT DELIBERATE AS REQUIRED BY LAW DURING THE PUNITIVE DAMAGES PHASE.

### XXVII. WHETHER THE PUNITIVE DAMAGE VERDICT WAS GROSSLY EXCESSIVE INDICATING BIAS, PASSION AND/OR PREJUDICE.

## XXVIII. WHETHER THE TRIAL COURT ERRED IN ALLOWING A PUNITIVE DAMAGE VERDICT WHICH VIOLATES THE MISSISSIPPI AND THE UNITED STATES CONSTITUTIONS.

¶69. These allegations of error all concern the punitive damages phase of the trial, and thus discussion of these issues is moot.

## XXIX. WHETHER THE 15% PENALTY STATUTE APPLICABLE TO APPEALS VIOLATES BOTH THE MISSISSIPPI AND THE UNITED STATES CONSTITUTIONS.

¶70. This Court has upheld the constitutionality of this statute, Miss. Code Ann. § 11-3-23 (2002), many times. *City of Jackson v. Williamson*, 740 So. 2d 818, 823 (Miss. 1999); *Wallace v. Jones*, 360 So. 2d 932, 933-34 (Miss. 1978); *Antley v. Mississippi State Highway Comm'n*, 318 So. 2d 847, 850 (Miss. 1975). We find that this issue is without merit.

## CONCLUSION

¶71. For the foregoing reasons, this Court affirms the judgment below, with the exception of Winters's damage award on her negligent infliction of emotional distress claim and the punitive damages award, both of which we reverse and render.

¶72. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**PITTMAN, C.J., WALLER, DIAZ, EASLEY AND CARLSON, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**COBB, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶73. Although I agree with the majority that this Court should reverse and render on the negligent infliction of emotional distress claim and the punitive damages verdict, I disagree and am compelled to write separately regarding the apportionment of damages.

¶74. According to the jury verdict, two principal factors combined to produce the terrible accident of September 14, 1994: the negligence of Illinois Central's employees in failing to curb the vegetation near the Mileston crossing and failing to sound the whistle soon enough, and LouBertha Cox's negligence in failing to look out for the train. This combined negligence tragically and needlessly took the lives not only of Cox but of two of her sons as well. The jury apportioned 95% of the fault to Illinois Central and its employees and only 5% to Cox. This nineteen-to-one apportionment is against the overwhelming weight of the evidence and displays obvious bias, prejudice, and passion on the part of the jury. This Court should remand for a new trial on the sole issue of apportionment of damages.

¶75. Instruction P-1 begins the jury's journey toward its erroneous conclusion. The majority concludes that while "Instruction P-1 arguably might be somewhat misleading as drafted, it does not rise to the level of reversible error in this case...." (Maj. Op. at ¶ 16). I disagree. In fact, Instruction P-1, which transposes the positive language of § 77-9-249(1)[(10)] into the negative, impermissibly twists the meaning of the statute.

Cast in the negative, Instruction P-1 reads as follows:

> You are instructed that at the time of the collision LouBertha Cox was *not required by Mississippi law to stop* before attempting to cross the tracks if
>
> a. neither the horn or the bell were sounded beginning at least 900 feet from the crossing, or
>
> b. the approaching train was *not* plainly visible and *is* in hazardous proximity.[11]

(emphasis added). The statute does *not* say "at all times but these, you need not stop," but rather, "you must stop under these circumstances" (without any implication that these are the *only* times one need stop). Counsel for the plaintiffs put forward the incorrect interpretation during conference on the instruction:

> [Plaintiffs' counsel:] Your Honor, in reading this section, it starts off, it says that motorist [sic] shall stop. And then it says "when the motorist shall stop." Okay, and you're looking at the list of things . . . . [Enumerates § 77-5-249(1)(a-d).] And what our instructions [sic] says that if one of those elements is absent, **then she doesn't have to stop.**

(emphasis added.)

¶76. The parallel jury instruction in a recent and similar case before this Court exactly followed the words of the statute, and should be the one we deem to be a correct statement of the law. In ***Alabama Great Southern R.R. v. Lee***, 2002 WL 938127 (Miss. 2002), instruction P-19 was given, which stated: "The Court instructs the jury that whenever any person driving a vehicle . . . ." (after which the exact language of the entirety of § 77-9-249 was given).

¶77. The Mileston crossing had a crossbuck on each side of the tracks. This Court has stated that the presence of crossbucks "entitle[s] [the railroad] to assume that approaching motor vehicle drivers would upon seeing the signs slow sufficiently to see whether or not a train was on or near the crossing." ***Wilner v. Miss. Exp. R.R.***, 546 So. 2d 678, 681-82 (Miss. 1989). Therefore, Cox had a legal duty to slow down enough so that she could see whether a train was approaching. The plaintiffs cannot have their cake and eat it too: if the vegetation was so overgrown that Cox could not tell at a glance whether a train was oncoming, then under ***Wilner***, she was obliged by the presence of the clearly visible crossbucks to slow down until a clearer view of the tracks was possible.

¶78. The interpretation of the case law advanced here is also congruent with plain common sense: if you can't tell whether there's a train nearby, then you need to slow down and take a look before crossing. The facts clearly show that Cox did not follow this common-sense procedure, but instead relied on her not hearing a whistle and on her from-a-distance evaluation that no train was coming, rather than allowing the existing conditions to determine her behavior.[12] Had she done the latter, as dictated by common sense, Cox and her sons would not have died on that September 14. Whatever Illinois Central's responsibility, Cox's responsibility was far from negligible.

¶79. For the jury to have so conspicuously found otherwise, by reducing Cox's part in causing this tragedy to 5%, can only be due to its sympathetic but legally unacceptable bias, passion, and prejudice, coupled with an instruction which did not properly state the Mississippi law. We should not hesitate to say so. Our deference to jury findings, while great, is not required to be blind:

The power of the court to review the evidence and set aside the verdict of the jury in a case of this kind on the ground that the verdict is against the overwhelming weight of the evidence is a necessary incident to the right of trial by jury itself. The power of the court to set aside the verdict of the jury and grant a new trial in such cases should be exercised with the utmost care. But no court may refuse to exercise such power when fully convinced of its duty to do so.

*Moak v. Black*, 230 Miss. 337, 348, 92 So. 2d 845, 850 (1957). We have steadfastly upheld our constitutional duty to reverse jury verdicts where bound to do so:

a verdict will be set aside on the grounds that it is not supported by reasonably believable proof, or is against the overwhelming weight of the evidence, only when it so appears "in such a convincing way as to be fairly inescapable upon the record as presented." The Court has the duty to assure litigants the right to trial by jury without abridgment and at the same time protect litigants against a jury that is partial, biased or prejudiced.

*Employers Mut. Cas. Co. v. Ainsworth*, 249 Miss. 808, 823, 164 So. 2d 412, 418-19 (1964) (quoting *Williams Yellow Pine Co. v. Henley*, 155 Miss. 893, 125 So. 552 (1930)). This Court's "duty to act when it should" in reversing a jury's findings "is just as compelling as the duty not to overturn a jury verdict when it should not." *Ainsworth*, 249 Miss. at 823, 164 So. 2d at 418.

¶80. This Court should not hesitate to conclude that no reasonable, hypothetical juror could have found that Cox's behavior amounted to *only 5%* of the fault that led to the accident. That is just plain wrong, no matter how favorably the facts are construed in the plaintiffs' favor. Cox's negligence did not bar recovery by her wrongful death heirs, and it need not have been calculated to amount to even half of the fault at issue; but 5% is self-evidently too low to any reasonable person, even accepting the plaintiffs' version of the facts in toto. No matter the vegetation, no matter whether the whistle blew on time, had Cox slowed down for the crossbucks until she had a clear view of the tracks, this accident would not have happened. To allot her only 5% of the fault is not only unreasonable, it is ludicrous.[(13)]

¶81. Thus, the majority too readily dismissed Illinois Central's assignment of error on the apportionment of fault. Of course, even if Cox was indeed "negligent as a matter of law by driving onto the crossing when the train was in hazardous proximity to the crossing and was plainly visible," because she failed to slow down enough that she could properly determine whether to stop as a matter of safety, that does not imply that this Court should simply reverse and render a verdict for Illinois Central. Because subsection (3)[(14)] of the statute deprives "negligent as a matter of law" of its old force at common law, a reasonable finding of comparative negligence on the part of Illinois Central would still have been proper.

¶82. Because I would find reversible error here, I respectfully dissent in part.

1. This is the result of dividing 125 by 14.667. The actual number is 8.52.

2. This is the product of multiplying 8.52 by 78. The actual number is 664.56.

3. This is figured by determining first how long it would take Cox to travel 55 feet (125 minus 70), which requires one to merely divide 55 by 14.667. The result is 3.74 seconds. In 3.74 seconds, the train would travel approximately 291.72 feet (78 multiplied by 3.74). Then by subtracting 291.72 from 664.56, one concludes that the train would be 372.84 feet from the crossing.

4. This instruction explains to the jury what it must find in order to award punitive damages.

5. An instruction directing the jury to not return a verdict for punitive damages.

6. This appears to be in conflict with the actual testimony as the engineer plainly testified that he saw Cox's vehicle when she was 100 feet from the crossing, and the train was 300 feet away.

7. Again, this was not the testimony presented by anyone.

8. One juror was vice-president of a bank with which Plaintiffs' counsel had some relationship. The second juror knew two of the plaintiffs, attempted to relate a personal experience regarding railroad crossings and had been over the subject crossing within a year of trial. The third juror knew some of the plaintiffs, and had gone to school with Cox (she was a year older than him).

9. A peremptory instruction directing the jury to find in favor of Wright.

10. This section contains four subsections which state when the driver shall stop and not proceed until it is safe to do so.

Subsection (c) states that a driver is required to stop when a " train approaching within approximately 900 feet of the highway crossing emits a signal" (bell, whistle or horn). This subsection then goes on to say " and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard." This last phrase was not included in Instruction P-1.

Subsection (d) states the requirement to stop when "an approaching train **is** plainly visible and is in hazardous proximity to such crossing." (emphasis added).

11. This was an incorrect statement of the law, and is misleading. Compare the language used in P-1 with the actual statutory text of (1)(d), quoted in footnote 1, *supra*. The language used in P-1, a crucial instruction, makes no literal sense.

12. The record reflects that Cox was very familiar with the location, as her mother's home was only 125 feet from the Mileston crossing, and she should have been aware of any dangers the overgrowth posed.

13. Our recent case law on vegetation-obscured railroad crossings does not speak to the apportionment of fault. *See **Lee***, 2002 WL 938127 (Miss. 2002) (apportionment not raised as error); ***Clark v. Ill. Cent. R.R.***, 794 So. 2d 191, 195-96 (Miss. 2001) (reversal of summary judgment for railroad, hence apportionment not reached); ***Kansas City So. Ry. v. Johnson***, 798 So. 2d 374, 377 (Miss. 2001) (apportionment not raised as error).

14.

> In the trial of all actions to recover personal injury or property damages, sustained by any driver of such vehicles for collision of said vehicle and train *in which action it may appear that the said driver may have violated any of the provisions hereof*, the question of whether or not the said violation was the sole or approximate cause of the accident and injury shall be for the jury to determine. *The violation of this section shall not of itself defeat recovery, and the question of negligence or the violation aforesaid shall be left to the jury; and the comparative negligence statutes and prima facie statute of this state shall apply in these cases as in*

> ***other cases of negligence.***

Miss. Code Ann. § 77-9-249(3) (2002) (emphasis added.)