# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00751-SCT

| | |
|---|---|
| *THE ALABAMA GREAT SOUTHERN RAILROAD COMPANY* | |
| *v.* | |
| *FREDDIE LEE, SR., ADMINISTRATOR OF THE ESTATE OF FREDDIE LEE, JR., DECEASED, AND FREDDIE LEE, SR., LINDA S. LEE, INDIVIDUALLY, AND MARVIN PIGFORD* | |

| | |
|---|---|
| DATE OF JUDGMENT: | 2/7/2000 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | R. WEB HEIDELBERG<br><br>ROBERT H. PEDERSEN<br><br>JAMES GARFUS THORNTON<br><br>JAMES A. BECKER, JR. |
| ATTORNEYS FOR APPELLEES: | MICHAEL B. McMAHAN<br><br>DEBORAH J. GAMBRELL<br><br>SANDRA S. MOHLER<br><br>JON MARK WEATHERS<br><br>LARRY NORRIS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 5/09/2002 |
| MOTION FOR REHEARING FILED: | 5/23/2002; denied 9/5/2002; mandate stayed for 30 days 10/10/2002 |
| MANDATE ISSUED: | 10/29/2002 |

**EN BANC.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1. The Estate of Freddie Lee, Jr. ("the Estate") instituted this wrongful death action against Alabama Great Southern Railroad ("AGS"), Amtrak, and Marvin Pigford ("Pigford") in the Circuit Court of Forrest County. Lee, a passenger in Pigford's vehicle, was killed when Pigford's vehicle collided with a train at a railroad crossing. Pigford, who was also injured in the accident, filed a cross-claim against AGS and Amtrak.

¶2. AGS and Amtrak removed the case to the United States District Court for the Southern District of Mississippi, Hattiesburg Division. The Estate and Pigford agreed to dismiss Amtrak from the action with prejudice, and the case was remanded to the circuit court. The Estate and Pigford voluntarily dismissed their claims for excessive speed and inadequate signalization. The case proceeded to trial on the theory that AGS negligently failed to maintain vegetation at the crossing. The jury returned a verdict in favor of the Estate against AGS, awarding the Estate $2.7 million in damages. The jury found for Pigford on the Estate's negligence claim against Pigford. The jury also found for Pigford on his cross-claim against AGS, awarding damages of $50,000. Judgment was entered accordingly. Following the circuit court's denial of its post-trial motions, AGS appealed to this Court.

## FACTS

¶3. The accident in question occurred at 9:30 a.m. on June 18, 1997, at the Eastabuchie Crossing in Forrest County, Mississippi. Eastabuchie Road runs from east to west, perpendicular to the tracks owned and maintained by AGS, which run north and south. Approximately 150 feet west of the crossing, Eastabuchie Road intersects Highway 11 which runs north and south, parallel to the railroad tracks. AGS owns a 100-foot right-of-way on either side of the tracks.

¶4. On the morning in question, Pigford and Lee traveled south on Highway 11 and turned east on Eastabuchie Road. The train was traveling north at a speed of 79 mph. The southwest quadrant of the crossing contained vegetation which obscured Pigford's view of the northbound train as he turned onto Eastabuchie Road. A portion of the vegetation was located on AGS's right-of-way.

¶5. The parties have stipulated that the speed of the train was not excessive and was within the applicable speed limit. It was also undisputed that the train blew its horn a half mile before the crossing, well before the whistle post, which is located a quarter mile before the crossing. The horn began sounding twenty seconds prior to impact and continued to sound until after the collision. The Estate and Pigford stipulated that the train's crew was not negligent in its operation.

¶6. As stated previously, the claims for inadequate signalization were dropped prior to trial. The signals located at the crossing were (1) a yellow advance warning sign containing the railroad symbol, located on Eastabuchie Road 110 feet west of the crossing, (2) a crossbuck sign located on Eastabuchie Road 15 feet from the crossing, and (3) pavement markings containing the railroad symbol, with a stop bar 18 feet from the crossing.

¶7. The speed limit on Eastabuchie Road is 55 mph. Pigford's vehicle was traveling at a speed of 20-25

mph. A video camera mounted in the front of the train recorded the accident. The video shows that Pigford's vehicle emerged from the vegetation and became visible when his vehicle was 3.3 seconds and 90 feet from the crossing. At this point, the train was 398 feet from the crossing. The video demonstrates that Pigford was able to bring his vehicle to a stop, but that the front of his car was slightly on the tracks. Lee was killed as a result of the collision, and Pigford was injured.

¶8. Pigford, who lived near the crossing and was familiar with the crossing, testified that he remembered nothing after turning off of Highway 11 onto Eastabuchie Road. He did state that he and Lee were listening to a gospel tape in the car.

¶9. The six-day trial conducted by Circuit Judge Richard W. McKenzie began on January 18, 2000. The Estate and Pigford offered expert testimony that the vegetation in the southwest quadrant of the crossing obstructed Pigford's view of the tracks and that AGS failed to cut the vegetation to a distance adequate to allow safe crossing. It was the opinion of the plaintiffs' experts that the sight distance was insufficient to allow Pigford enough time to perceive the train and to avoid a collision. AGS offered expert testimony that the sight distance at the crossing was adequate had Pigford been approaching at a reasonable speed and had he been prepared to stop.

¶10. The circuit court denied AGS's motion for directed verdict at the close of the plaintiffs' case and at the close of AGS's defense. The court also refused AGS's request for a peremptory instruction as to Pigford's negligence in failing to stop at the crossing.

¶11. The jury returned a verdict for the Estate against AGS in the amount of $2.7 million and returned a verdict for Pigford in the amount of $50,000 on his cross-claim against AGS. The jury returned a verdict for Pigford on the Estate's claim against Pigford. On February 7, 2000, the circuit court entered a final judgment on the verdict. AGS timely filed a Motion for Judgment Notwithstanding the Verdict or, in the alternative, for a New Trial, or for a Remittitur. The post-trial motions were denied on April 4, 2000, and AGS filed its notice of appeal on May 3, 2000. AGS raises the following issues:

> **I. DID THE TRIAL COURT ERR BY DENYING AGS'S MOTIONS FOR DIRECTED VERDICT, REQUEST FOR A PEREMPTORY INSTRUCTION, AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.**

> **II. DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING AGS'S MOTION FOR A NEW TRIAL.**

**STANDARD OF REVIEW** ¶12. This Court's standard of review for the denial of a judgment notwithstanding the verdict, peremptory instruction, and directed verdict is as follows:

> [T]his Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.

***Steele v. Inn of Vicksburg, Inc.***, 697 So. 2d 373, 376 (Miss. 1997). This Court will reverse a trial court's denial of a request for new trial only when the denial amounts to an abuse of discretion. ***Id.*** (citing ***Shields v. Easterling***, 676 So. 2d 293, 298 (Miss.1996)).

## DISCUSSION

### I.

¶13. AGS argues that the trial court erred by denying its motion for directed verdict, motion for judgment notwithstanding the verdict, and request for a peremptory instruction. First, AGS asserts that this Court has never recognized the duty of a railroad to maintain vegetation on its right-of-way. AGS urges this Court to align itself with other jurisdictions which hold that the failure to cut vegetation is not actionable negligence. *See, e.g.,* ***Alabama Great S.R.R. v. Johnston***, 199 So. 2d 840, 844 (Ala. 1967). Contrary to AGS's assertion, this Court has recognized that a railroad has a duty to maintain vegetation on its right-of-way and that the failure to do so is actionable negligence. *See* ***Clark v. Illinois Cent. R.R.***, 794 So. 2d 191 (Miss. 2001); ***Kansas City S. Ry. v. Johnson***, 798 So. 2d 374 (Miss. 2001).

¶14. Second, AGS argues that Pigford's negligence was the sole proximate cause of the accident and that the failed to show that AGS negligently maintained its right-of-way. The evidence at trial as to the hazardous conditions at the crossing as well as the adequacy of the sight distance were questions for the jury. Viewing the evidence in the light most favorable to the Estate and Pigford, we find that reasonable and fair-minded jurors might have concluded that AGS negligently maintained its right-of-way and that AGS's negligence was the proximate cause of the accident.

¶15. AGS also argues that the trial court erred in refusing to instruct the jury that Pigford's violation of Miss. Code Ann. § 77-9-249 was negligence per se. AGS claims that Pigford breached both common law and statutory duties by failing to stop at the sound of the horn and when the train was visible. At common law, it was the duty of a driver to do that which was reasonably necessary to ascertain whether a train was approaching before driving onto the track. ***Columbus & Greenville R. Co. v. Lee***, 149 Miss. 543,115 So. 782, 785 (1928). Today, the duties and obligations at railroad crossings, both on the part of drivers of automobiles and operators of railroads, are predominately a matter of statutory law. The principal statute that describes the duties of drivers is Miss. Code Ann. § 77-9-249, which provides, in pertinent part:

> (1) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
>
> (a) . . . .;
>
> (b) . . . .;
>
> (c) A railroad train approaching within approximately nine hundred (900) feet of the highway crossing emits a signal in accordance with Section 77-9-225, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
>
> (d) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.

(2) . . . .

(3) In the trial of all actions to recover personal injury or property damages, sustained by any driver of such vehicles for collision of said vehicle and train in which action it may appear that the said driver may have violated any of the provisions hereof, *the question of whether or not the said violation was the sole or approximate cause of the accident and injury shall be for the jury to determine. The violation of this section shall not of itself defeat recovery, and the question of negligence or the violation aforesaid shall be left to the jury*; and the comparative negligence statutes and prima facie statute of this state shall apply in these cases as in other cases of negligence.

(4) At any railroad grade crossing provided with visible railroad crossbuck signs without automatic electric or mechanical signal devices, crossing gates or a human flagman giving a signal of the approach or passage of a train, the driver of a vehicle shall, in obedience to such railroad crossbuck sign, yield the right-of-way and slow to a speed reasonable for the existing conditions, and shall stop if required for safety at a clearly marked stop line, or if no stop line, within fifty (50) feet, but not less than fifteen (15) feet, from the nearest rail of the railroad, and shall not proceed until he can do so safely. . . .

Miss. Code Ann. § 77-9-249 (2001) (emphasis added).

¶16. This Court has stated that § 77-9-249 imposes a duty upon the driver to stop when one of the enumerated conditions is met. *Mitcham v. Illinois Cent. Gulf R.R.*, 515 So. 2d 852, 854 (Miss. 1987). Instruction P-19 informed the jury of the contents of the § 77-9-249, but the trial court refused instruction D-2, a peremptory instruction as to Pigford's negligence. AGS argues that Pigford's failure to stop at the sound of the horn violated § 77-9-249 and constituted negligence per se. We find that the trial court did not err by refusing to instruct the jury that Pigford's violation of § 77-9-249 was negligence per se.

¶17. Subsection (3) of § 77-9-249 takes a violation of this statute outside the realm of negligence per se and makes it a jury question. The section clearly states that "the question of negligence or the violation of aforesaid shall be left for the jury." In spite of this statutory provision, the dissent argues that because the train sounded its whistle in accordance with the statute, the jury should have received an instruction on negligence per se due to Pigford's failure to stop. The dissent completely ignores the provision on negligence. Based on the clear language of the statute, any instructions involving negligence per se would have been a direct rejection of statutory law.

¶18. The dissent would have this Court adopt a rule that states that as long as the train fulfilled its duty in blowing its whistle, then regardless of the train's visibility, the driver's failure to stop is negligence per se. This is dangerous for drivers who approach railroad crossings in which there is no duty to stop. Not only should the driver be able to hear the train, he should also be able to see the train. Miss. Code Ann. § 77-9-249(d). Under subsection (d), the Legislature provided that the approaching train must also be plainly visible before the driver has a duty to come to a complete stop. Under the dissent's reasoning, so long as the train blows its horn, it would not matter whether a fast traveling train was visible at a railroad crossing that is without the benefit of a stop sign, stop lights, warning lights, or stop beam. According to the dissent, even if Pigford could not hear the train and failed to stop before the crossing, then he was negligent as a matter of law, regardless of whether he could see the train. This logic creates a duty for the driver to be able to hear the train, despite whatever forces might cause the train's horn to be unheard.

¶19. The train approached at approximately 79 miles per hour through an intersecting road with nothing other than its horn and a clear line-of-sight to warn drivers of its approach. As evidenced by the record and audio/video recording, Pigford's speed was not excessive. He approached the crossing traveling at about 20 mph. According to experts, Pigford had only 3.3 seconds from the time the train was visible until he was able to stop just a few feet over the railroad tracks. Expert testimony indicated that the vegetation which blocked Pigford's line of sight as the train approached was excessive. The Legislature did not intend for courts to find drivers negligent as a matter of law as long as the train sounded its horn and the driver failed to stop.

¶20. A railroad has a duty to maintain vegetation on its right-of-way and that failure to do so is actionable negligence. *Clark*, 794 So. 2d at 195. The record contains substantial evidence, including a video/audio recording of the accident, which shows the vegetation that allegedly blocked Pigford's line-of-sight. This Court has stated that "[t]he nature of the obstruction and whether one must come dangerously close to the crossing before being able to see the train are factual questions to be resolved by the finder of fact." *Id.* The jury was aware of the requirements of Miss. Code Ann. § 77-9-249, and the jury was left with the sole responsibility of weighing the evidence and determining whether negligence existed. The trial court's refusal to grant AGS an instruction on negligence per se did not affect the jury's consideration of the sole or approximate negligence attributable to parties in this case.

¶21. Furthermore, the trial judge gave the jury an instruction on apportionment of damages. The amounts of damages awarded in this case, $2.7 million to the estate and $50,000 to Pigford, appears to illustrate the juries consideration of the negligence attributable to the parties. The jury effectively reduced Pigford's damages to $50,000, presumably, in consideration of any negligence attributable to Pigford.

¶22. In its motion for judgment notwithstanding the verdict, AGS argued that Pigford's negligence was the sole proximate cause of the accident. As stated in § 77-9-249, the violation of the statute does not itself defeat recovery, and the question of whether a violation is the sole or proximate cause of the accident and injury is for a jury to determine.

¶23. The plaintiffs' experts, Al Gonzales and Brett Alexander, testified that the sight triangle at the crossing was inadequate based on the speed of the train and the speed of Pigford's vehicle. Both testified that Pigford did not have enough time, distance, or opportunity to see the train, decide what to do, and carry out that decision. As demonstrated by a video recording of the accident, Pigford had between 3.3 and 3.4 seconds to see and react to the oncoming train. Gonzales testified that Pigford saw the train as soon as he could have been expected to see it.

¶24. George Dase, a bush-hog operator employed by AGS, testified that AGS did not inform him as to how far back to cut the vegetation at its crossings. He stated that he just followed the pattern established in years before. David Bankston, track supervisor for AGS, testified that he is responsible for care of the track, road bed, and right-of-way. He stated that he received no formal training from AGS regarding proper sight distances at the crossings.

¶25. Evidence as to the hazardous conditions of the crossing as well as the adequacy of the sight distance were clearly questions for the jury. As we stated recently in *Clark*:

> Ordinary care requires the railroad company to meet the unusual conditions of a railroad crossing with unusual precautions, particularly where the dangerous condition results from obstructions of view

which prevent a traveler from seeing an approaching train until he is dangerously close to the track. The nature of the obstruction and whether one must come dangerously close to the crossing before being able to see the train are factual questions to be resolved by the finder of fact.

794 So. 2d at 192 (citations omitted).

¶26. AGS's also argues that the plaintiffs' vegetation claim is preempted by federal law. This argument is without merit. AGS first contends that because signalization issues are federally preempted, the vegetation claims are also barred. AGS asserts that the determination of which signals to install at a crossing takes into consideration limited sight distance. This argument was rejected by this Court in *Clark*. *Id*. at 193-94

¶27. Next, AGS argues that 49 C.F.R.§ 213.37 (1994) covers the subject matter of vegetation. 49 C.F.R. § 213.37 provides:

Vegetation on railroad property which is on or immediately adjacent to roadbed must be controlled so that it does not - (a) Become a fire hazard to track-carrying structures; (b) Obstruct visibility of railroad signs and signals; (c) Interfere with railroad employees performing normal trackside duties; (d) Prevent proper functioning of signal and communication lines; or (e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.

The record demonstrates that the vegetation near the Eastabuchie crossing was not on or immediately adjacent to the roadbed. Caselaw from other jurisdictions supports the interpretation that this section preempts state law claims only where vegetation is on or immediately adjacent to the roadbed. *Easterwood v. CSX Transp. Inc.*, 933 F.2d 1548 (11th Cir. 1991), *affirmed on other grounds*, 507 U.S. U.S. 658, 113 S. Ct 1732, 123 L. Ed. 2d 387 (1993); *Missouri Pac. Ry. v. Railroad Comm'n of Texas*, 833 F.2d 570 (5th Cir. 1987). Also, the regulation does not speak to the duty, which has been recognized by this Court, of the railroad to control vegetation so that it does not obstruct a motorist's visibility of oncoming trains. It speaks only to obstructing the visibility of signs and signals. And, again, this Court has already held that the fact that signalization issues are preempted does not preempt vegetation claims. *Clark,* 794 So. 2d at 194.

¶28. Finally, AGS argues that because excessive speed claims are preempted, vegetation claims are preempted as well. AGS contends that obstructions by vegetation are considered when speed limits for trains are promulgated. This is essentially the same argument as that regarding signalization issues, which this Court expressly rejected in *Clark*. It is likewise without merit.

## II.

¶29. AGS argues that the trial court abused its discretion in denying its motion for a new trial. AGS argues that the trial court erred in refusing instruction D-2. As discussed above, the trial court did not err in refusing to instruct the jury that Pigford's violation of § 77-9-249 was negligence per se. Accordingly, the judgment against AGS should be affirmed. All remaining allegations of error are without merit or are procedurally barred for failure to make a contemporaneous objection.

## CONCLUSION

¶30. The trial court did not err in denying the motion for directed verdict, motion for judgment notwithstanding the verdict, and request for a peremptory instruction. The jury was properly instructed as to

the requirements and duties of AGS and Pigford under Miss. Code Ann. § 77-9-249. The judgment against AGS is affirmed.

¶31. **AFFIRMED.**

**McRAE, P.J., EASLEY AND GRAVES, JJ., CONCUR. CARLSON, J., CONCURS IN RESULT ONLY. SMITH, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER AND COBB, JJ. PITTMAN, C.J., NOT PARTICIPATING.**

**SMITH, PRESIDING JUSTICE, DISSENTING:**

¶32. The majority is correct in its finding that evidence regarding the hazardous conditions at the crossing, as well as the adequacy of the sight distance, was a question for the jury. However, the majority incorrectly holds that Pigford must be able to both hear and see the train before he is required to stop at the crossing. Equally amazing is the majority's claim that there is no duty to stop at this railroad crossing. The majority is incorrect in its reasoning and resolution of this case. The trial court erred in refusing to instruct the jury that Pigford's violation of Miss. Code Ann. § 77-9-249 (2001) in failing to stop at the crossing was negligence per se. The majority ignores the statute and controlling precedent of this Court. As I would reverse and remand for a new trial, I dissent.

¶33. This Court has stated that § 77-4-249 imposes a duty upon the driver to stop when one of the enumerated conditions is met. *Mitcham v. Illinois Cent. Gulf R.R.*, 515 So. 2d 852, 854 (Miss. 1987). AGS asserts that Pigford violated section (1)(c) of this statute by failing to stop when the train's horn was blown.

¶34. The undisputed evidence at trial, both testimonial and demonstrative, showed that the engineer began sounding the horn one-half mile before the crossing, well before the whistle post at one-quarter mile, and that he sounded the horn continuously through the crossing. Stated otherwise, the engineer sounded the horn more than 2,300 feet before the train reached the crossing, which greatly exceeded the 300 yard (900 feet) requirement of § 77-9-225. The horn blew for 20 seconds before the collision. It is noteworthy that the plaintiff confessed that the horn was sounded by the engineer. However, the plaintiff then maintains that the horn wasn't heard by the occupants of the vehicle. The majority, ignoring precedent caselaw, then puts its stamp of approval on this statement by holding that, "Not only should the driver be able to hear the train, he should be able to see the train." Majority at ¶18. More importantly, the undisputed evidence demonstrated that at 50 feet from the crossing, Pigford had an unobstructed view of the approaching train, and that at the stop bar, 18 feet from the crossing, he could see over 1000 feet down the track.

¶35. This Court's decision in *Mitcham* is instructive in applying § 77-9-249 to the case at bar. It was alleged in *Mitcham* that the railroad company failed to provide an adequate unobstructed line of view at its crossing. Evidence showed that though there was vegetation on the railroad's right-of-way, at a distance of 22 feet from the crossing, a driver could clearly see an approaching train at approximately 950 feet distance down the tracks. As in the case at bar, the driver in *Mitcham* approached the tracks at a speed of approximately 25 mph. Additionally, the train in *Mitcham* was sounding its horn as required by statute, which under § 77-9-249(1)(c) is an enumerated condition under which a duty to stop within 50 feet but not less than 15 feet arises on the part of the driver. 515 So. 2d at 855. The jury returned a verdict for the railroad, and the plaintiff appealed. The appellant argued that a driver should have sufficient unobstructed vision to execute a safe and lawful stop *after* seeing an oncoming train. 515 So. 2d at 855. In rejecting this

argument, this Court stated that the train's horn was sounded in accordance with § 77-9-225 and that the driver was required by § 77-9-249 to "take such measures as will allow him to come to a stop not less than fifteen (15) feet from the nearest rail, and not proceed until he can do so safely." *Id.* This Court cited favorably a Texas case in which the Texas Supreme Court, construing a statute very similar to § 77-9-249, held that "the duty to stop imposed by the blowing of the whistle and the ringing of the bell applies *regardless of the train's visibility* at the time." 515 So. 2d at 855 (citing *Southern Pac. Co. v. Castro*, 493 S.W.2d 914, 495 (Tex. 1973) (emphasis added)). *See Dale v. Bridges*, 507 So. 2d 375 (Miss. 1987) (Prima facie case of negligence where driver violated the statute by not stopping at the crossing); *Tech Lines, Inc. v. Pope*, 175 Miss. 393, 166 So. 539 (1936) (passenger could recover as a matter of law where bus driver, traveling 25 mph, made no attempt to stop at crossing until within less than 10 ft. of crossing and railroad was not negligent). *See also New Orleans & Northeastern R.R. v. Weary*, 217 So. 2d 274 (Miss. 1968) (statute requires motorists to stop prior to reaching crossing).

¶36. Instruction P-19 informed the jury of the contents of the § 77-9-249, but the trial court refused instruction D-2, a peremptory instruction as to Pigford's negligence. Pigford's violation of this statute constitutes negligence per se, and AGS was entitled to a peremptory instruction as to Pigford's negligence. *See Munford, Inc. v. Peterson*, 368 So. 2d 213, 217 (Miss. 1979). The majority incorrectly finds otherwise. Section 77-9-249 (1) states:

> (1) Whenever any person driving a vehicle approaches a railroad grade crossing **under any of the circumstances** stated in this section, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
>
> (a) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;
>
> (b) A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;
>
> (c) A railroad train approaching within approximately nine hundred (900) feet of the highway crossing emits a signal in accordance with Section 77-9-225, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
>
> (d) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.

Miss. Code Ann. § 77-9-249 (2001) (emphasis added). A plain reading of this section illustrates the fallacy of the majority's reasoning. While it is true that there is not a conjunctive or disjunctive connector (i.e. and/or) following subsection (c), this does not change the clear meaning of the statute. The statute states that if *any* of the circumstances listed within the section exist, then a driver has a duty to stop. Thus, the majority's finding that the Legislature intended for all four scenarios to take place simultaneously before holding a driver responsible for stopping is erroneous, not to mention ridiculous. Under the majority's reasoning a driver is required to stop if an electric or mechanical signal emits a warning, a gate is lowered or a flagman gives warning, a train whistles its warning *and* the train is visible. Why hold a driver responsible for stopping at all? Besides, here there was no electric or mechanical signal, no crossing gate and no human flagman. Thus, only (c) or (d) could possibly apply. It should be obvious that this type crossing with only a crossbuck sign on a post and a stop bar painted on the pavement is very likely the most dangerous of all

crossings. Consequently, motorists must slow down and be prepared to stop, look, and listen prior to proceeding across the railroad tracks. Here, Pigford did none of the above until he was on the railroad tracks.

¶37. The record shows that at the stop bar painted on the pavement, 18 feet from the track, Pigford had a view of over 1,000 feet down the track. The record also shows that Pigford had an unobstructed view of the train at 90 feet from the crossing. Necessarily, had Pigford stopped or attempted to stop even 50 feet from the track, he would have seen the approaching train. This evidence is undisputed.

¶38. The plaintiffs' experts, Al Gonzales and Brett Alexander, testified that the sight triangle at the crossing was inadequate based on the speed of the train and the speed of Pigford's vehicle. Both testified that Pigford did not have enough time, distance, or opportunity to see the train, decide what to do, and carry out that decision. As demonstrated by a videotape of the accident, Pigford had between 3.3 and 3.4 seconds to see and react to the oncoming train. Gonzales testified that Pigford saw the train as soon as he could have been expected to see it. All of this testimony centers solely upon visibility of the train under subparagraph (d) of the statute. Gonzales and Alexander based their opinions *solely* upon guidelines promulgated by the American Association of State Highway and Transportation Officials (AASHTO). The AASHTO standards for adequate sight distance are based on the respective speeds of the vehicle and the train.

¶39. However, as previously discussed, Pigford's speed of 25 mph approaching the crossing was, as a matter of law, unreasonable. Pigford made no attempt to reduce his speed much less stop as required by statute. The appellees put on absolutely no evidence as to the standards governing sight distance at 50 feet from the tracks or at the stop bar, also referred to as corner sight distance. In fact, Gonzales testified that the standards governing corner sight distance did not apply to this case. Gonzales testified that a driver has no duty to stop at the sound of a train's horn unless he can see the train and determine that the train is within 900 feet. Such testimony is totally contrary to § 77-9-249 and this Court's holding in **Mitcham**, in which this Court held that the duty to stop at the sound of the horn applies regardless of the train's visibility. **Mitcham**, 515 So. 2d at 855 (citing **Southern Pac. Co. v. Castro**, 493 S.W.2d at 495.

¶40. It is, however, more than a slight possibility that the verdict would be greatly altered by such a negligence per se instruction. If such an instruction had been given, it is entirely possible that Pigford, and not AGS, would have been found to be the negligent party proximately causing the accident. At the very least the jury could have considered Pigford was comparative negligent in failing to stop at the crossing in some percentage in returning its verdict. Thus, the verdict awarded against AGS in favor of the Estate may have been dramatically diminished or nonexistent. Thus, it is illogical to assert that the refusal to grant such an instruction would not affect the verdict. Equally illogical is the majority's claim that the jury, "effectively reduced Pigford's damages to $50,000, persumably, in consideration of any negligence attributed to Pigford." This statement reflects rank speculation by the majority as the record reflects that the form of the jury verdict does not contain language indicating the jury found Pigford to be negligent in any way for this accident. Nor did the jury find for Pigford and then reduce the verdict based upon any percentage of Pigford's negligence. The jury simply returned a verdict in favor of Pigford.

¶41. In my view, the jury should have been instructed that Pigford's violation of § 77-9-249 was negligence per se. The trial court erred in refusing to so instruct the jury. I respectfully dissent.

**WALLER AND COBB, JJ., JOIN THIS OPINION.**