# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-00585-SCT

*GALLAGHER BASSETT SERVICES, INC.*

*v.*

*GARY LEE MALONE AND NABORS DRILLING USA, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/06/2006 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL A. HEILMAN |
| | PATRICIA J. KENNEDY |
| | CHRISTOPHER T. GRAHAM |
| ATTORNEYS FOR APPELLEES: | JOSEPH A. O'CONNELL |
| | MARK A. NELSON |
| | RICHARD O. BURSON |
| | DORIS T. BOBADILLA |
| | THOMAS J. SMITH |
| | TOMMY SMITH |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND REMANDED - 01/07/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     Gary Lee Malone's right leg was amputated below the knee approximately two years after he suffered a work-related injury.  Subsequently, Malone instigated this bad-faith lawsuit against several defendants, including his former employer, Nabors Drilling USA, Inc.

(Nabors), and a workers' compensation insurance claims adjuster, Gallagher Bassett Services, Inc. (Gallagher Bassett). Malone argued that the defendants' bad-faith delay in paying his viable workers' compensation claim proximately caused him to delay medical treatment, eventually resulting in the loss of his leg.

¶2.     Nabors cross-claimed against Gallagher Bassett for breach of contract, asserting that it was a third-party beneficiary of a contract between Nabors's workers' compensation insurance carrier, CNA Insurance Services (CNA), and Gallagher Bassett. Nabors argued that Gallagher Bassett's bad-faith delay in paying Malone's workers' compensation claim proximately caused Nabors to incur potential liability and defense costs from Malone's bad-faith lawsuit.

¶3.     Subsequently, Nabors and Malone entered into a written agreement commonly referred to as a "Mary Carter" settlement agreement,[1] in which Nabors paid Malone $1.5 million and remained a litigant in the case. In the settlement agreement, the parties agreed that Nabors's liability to Malone arose out of Gallagher Bassett's bad-faith failure to timely pay Malone's workers' compensation claim.

¶4.     After a trial in the Circuit Court of Jones County, the jury found Gallagher Bassett and Nabors liable for bad faith in handling Malone's workers' compensation claim and awarded compensatory damages to Malone in the amount of $250,000. The jury also found Gallagher

---

[1]A Mary Carter agreement is a contract whereby the contracting defendant settles with the plaintiff, but remains a litigant in the case and will be reimbursed a specified amount of the plaintiff's recovery from the other defendants. *McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298 (5th Cir. 1993).

Bassett liable to Nabors on the cross-claim for breach of contract and awarded compensatory damages in the amount of $1.25 million. Gallagher Bassett appeals; Malone and Nabors both cross-appeal.

## FACTS

¶5. Malone worked for Nabors as a motorman on an oil rig in Jones County, Mississippi. Nabors, an oil and gas drilling company, had workers' compensation insurance with CNA Insurance Company (CNA). CNA had a claims-service agreement with Gallagher Bassett under which Gallagher Bassett would adjust Nabors's workers' compensation claims during times relevant to this appeal.

¶6. We set out the facts leading up to Malone's instigation of this lawsuit in the following time line:

**July 28, 2000** – Malone struck his front lower right leg on a beam at work and suffered a cut at the site of a recurrent skin infection.[2] Malone reported the injury to his supervisor, Bobby Wallace, who put a Band-Aid on the cut, filled out an incident report, and notified his supervisor, Rob Holbrook.

**August 7, 2000** – Malone visited his family physician, Dr. William Moak, who recommended that Malone keep the cut clean and bandaged.

**August 14, 2000** – At a follow-up visit, Dr. Moak observed that one centimeter of Malone's shin bone was exposed in the middle of the cut. Dr. Moak informed Malone that he needed skin-graft surgery and referred him to the Southern Bone and Joint Clinic.

---

[2] It is undisputed that Malone had longstanding medical problems at this location on his right leg for which he had received prior medical treatment. The deposition of his family physician, Dr. William Moak, reveals that Dr. Moak had treated the site on several occasions for skin infection and, later, for osteomyelitis, an infection of the bone. Dr. Rocco Barbieri, an orthopedist, testified that Malone reported a twenty-year history of problems at the site.

3

**August 15, 2000** – Malone informed Wallace that he needed surgery; Wallace instructed him to discuss the matter with Holbrook.

**August 16, 2000** – Gallagher Bassett's claims adjuster, Deborah Robichaux, called Wallace to discuss Malone's injury. Wallace informed Robichaux that, although Malone had cut his leg at work and he needed surgery, Malone's need for surgery might be attributable to his pre-existing condition. After the telephone conversation, Robichaux did nothing further toward investigating Malone's potential workers' compensation claim.

**August 16, 2000** – Dr. Keith Melancon and Dr. Rocco Barbieri at the Southern Bone and Joint Clinic recommended that Malone have surgery.

**August 16, 2000** – Malone discussed his anticipated surgery with Holbrook. According to Malone, Holbrook refused to allow him to make a workers' compensation claim for the surgery.[3] In contrast, Holbrook testified that, although Malone had informed him that he needed surgery, Malone did not tell him the need for surgery was attributable to his work-related leg injury. It is undisputed that Malone asked Holbrook to approve his working eight weeks in a row in order to have eight weeks off to recover from the surgery; Holbrook approved the request.

**August 30, 2000** – Dr. Barbieri diagnosed Malone with a bone infection known as chronic osteomyelitis, and informed him that delaying surgery would risk the loss of his leg. After this visit, Malone worked eight weeks in a row.

**October 23, 2000** – Dr. Barbieri performed a bone scraping and a skin-graft surgery on Malone's leg wound. Malone's family medical insurer paid his medical expenses.

**January 24, 2001** – Malone fell and broke his injured leg; he suffered continuing problems with his leg thereafter.

---

[3] Malone testified that, not only did Holbrook refuse to allow him to seek workers' compensation benefits, but Wallace told him not to tell anyone at the district office or the corporate office about having received medical treatment, because the rig would lose its safety bonus for that period if there was a workers' compensation injury.

**January 31, 2001** – Nabors terminated Malone due to his inability to return to work due to a non-work-related injury.

**February 26, 2001** – Malone applied for social security benefits; in his application, he swore that he had not filed a workers' compensation claim, nor did he plan to do so.

**November 19, 2001** – Malone contacted Nabors's safety director, Jerry Poole, and informed him he was ready to return to work after the injury.

**November 27, 2001** – Poole completed a "B-3 first report of injury" form[4] and faxed the form to Robichaux at Gallagher Bassett.

**December 5, 2001** – Gallagher Bassett opened a claim file and sent medical release forms to Malone.

**January 9, 2002** – Nabors entered information concerning Malone's injury into its incidents database.

**June 21, 2002** – Robichaux closed the claim file on Malone's injury because she had never received medical records from Malone.

**July 12, 2002** – Malone filed a petition to controvert with the Mississippi Workers' Compensation Commission (the Commission).

**July 23, 2002** – Robichaux reopened the claim file after being notified of the petition to controvert.

**August 19, 2002** – Dr. Barbieri amputated Malone's injured leg below the knee due to a recurrence of infection.

**September 9, 2002** – Gallagher Bassett set Malone's claim for payment of full workers' compensation indemnity and medical benefits. Subsequently, the Commission entered an order recognizing that Malone had received a net

---

[4] In the event of an injury which causes lost time in excess of five days, Mississippi Code Section 71-3-67 requires the employer to file a report with the Mississippi Workers' Compensation Commission on a form approved by the Commission. Miss. Code Ann. § 71-3-67 (Rev. 2000). This form is commonly known as a "B-3" form. There was no evidence that Nabors had completed a B-3 form prior to November 27, 2001.

balance of $111,684.22 in indemnity benefits after subtracting sums paid to him in penalties and interest, and his attorney's fees.

**December 3, 2003** – Malone filed the instant bad-faith lawsuit in the Circuit Court of Jones County, alleging that the defendant's delay in processing this workers' compensation claim caused his injured leg to deteriorate to the point that it required amputation.

*A. Pre-trial proceedings*

¶7.     On September 30, 2005, Nabors cross-claimed against Gallagher Bassett, asserting it was a third-party beneficiary of Gallagher Bassett's contract with CNA. Nabors argued that Gallagher Bassett's bad-faith delay in paying the claim had proximately caused Malone's damages, and it sought to recover from Gallagher Bassett all costs it incurred in the defense of Malone's bad-faith claim.

¶8.     On October 15, 2005, Malone and Nabors entered into a Mary Carter agreement that resolved all claims between them. In the agreement, Nabors agreed to pay Malone $1.5 million for his physical injuries caused by the bad-faith actions of Gallagher Bassett, and Nabors reserved the right to continue as a defendant in the matter. The parties further agreed that Nabors would receive the first $250,000 of any sums awarded to either party against Gallagher Bassett, and Malone and Nabors would divide equally any additional sums awarded to either party.

¶9.     On November 2, 2005, Gallagher Bassett filed a cross-claim against Nabors that sought indemnification for any damages arising out of Malone's bad-faith claim.

6

*B. The trial*

¶10.    At trial, Malone sought to prove that Gallagher Bassett's failure to investigate and pay his legitimate workers' compensation claim had caused him to delay the surgery, which proximately caused the amputation of his leg.  He presented the expert testimony of Dr. Melancon, who testified to a reasonable degree of medical certainty that the delay caused an increase in infection that necessitated aggressive surgery, and caused or contributed to the amputation.  Nabors attempted to show that Gallagher Bassett's failure to promptly investigate and pay the claim after August 16, 2000, proximately caused Malone's damages, constituted a breach of Gallagher Bassett's contract with CNA, and proximately caused Nabors's liability to Malone.  Gallagher Bassett's position was that it had no duty to investigate the claim until November 27, 2001, when Poole faxed the B-3 first-report-of-injury form to Robichaux.

*C. The jury verdicts and post-trial proceedings*

¶11.    After all parties had rested at trial, the jury assessed compensatory damages to Malone in the amount of $250,000.  The jury allocated fault as follows: 42.5 percent to Gallagher Bassett, 42.5 percent to Nabors, and 15 percent to Malone.  Applying these percentages of fault, the trial court entered final judgments in favor of Malone against Nabors and Gallagher Bassett in the amounts of $106,250 each.

¶12.    The jury also found for Nabors on its cross-claim against Gallagher Bassett and assessed damages in the amount of $1.25 million.  The trial court entered a final judgment on this verdict.  The trial court declined to submit the issue of punitive damages to the jury.

7

After the entry of final judgment, Gallagher Bassett moved for a set-off and for judgment notwithstanding the verdict (JNOV). Malone moved for a JNOV, additur, or a new trial on damages, and Nabors moved for a JNOV seeking additur. The trial court denied all post-trial motions.

## ANALYSIS

¶13. While the parties raise multiple issues before this Court, the most challenging issue we face is that we are confronted with jury verdicts which reflect contradiction and inconsistency. The jury was asked to consider both the independent tort of bad-faith denial of a workers' compensation claim and a separate claim, purely contractual in nature, between employer Nabors and adjuster Gallagher Bassett. It is our duty to harmonize these verdicts, if at all possible. *See Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119, 83 S. Ct. 659, 9 L. Ed. 2d 618 (1963).

¶14. On the one hand, the jury returned a verdict in favor of Malone and allocated fault at 42.5 percent each to Nabors and Gallagher Bassett and established Malone's damages in the amount of $250,000. The jury's second verdict found, on a theory of breach of contract and/or indemnity (the jury was instructed on both), that Gallagher Bassett was liable to Nabors for $1.25 million – a figure five times the amount which the jury had established as reasonable damages to Malone.

¶15. Additionally, jury instruction D-34 (an instruction presented by Nabors) told the jury that in order to find for Nabors on their claim, it must find "that nothing Nabors Drilling, U.S.A., L.P., did contributed to the damages, if any, suffered by Malone. . . ." The jury's

8

finding that Nabors was as much at fault as Gallagher Bassett clearly is in direct conflict with its finding that Nabors did nothing which contributed to Malone's damages.

¶16. In post-trial motions, Malone argued *inter alia* for additur, claiming that the verdict was the result of bias and confusion resulting from conflicting jury instructions. Nabors, post-trial, additionally sought additur. Gallagher Bassett, in post-trial motions, argued that both verdicts fail as a matter of law, and pointed the court to the contradictions raised by the verdicts. The trial court denied all post-trial motions.

¶17. We have done our best to reconcile the verdicts after an exegetic review of the record, especially concentrating on the jury instructions, jury verdict, and the post-trial motions. However, we are left with the inescapable conclusion that the jury obviously was (as Malone asserted in post-trial motions) confused. Ultimately, we conclude that there is no way these two verdicts can be reconciled, as they create an uncertainty that is fundamentally unacceptable. After careful consideration, we find that the appropriate remedy is to vacate both judgments and remand this case for a new trial. *See **Gallick v. Baltimore & Ohio R.R. Co.***, 372 U.S. 108, 119, 83 S. Ct. 659, 9 L. Ed. 2d 618 (1963) (ruling that appellate courts are free to remand for new trial when the jury delivers inconsistent verdicts that cannot be harmonized); *see also **Gordon v. Degelmann***, 29 F.3d 295, 298-99 (7th Cir. 1994) (ruling that "[t]here is no priority among inconsistent verdicts . . .[and] the proper thing to do is to hold a new trial with respect to all affected parties"); ***Wood v. Holiday Inns, Inc.***, 508 F.2d 167, 175 (5th Cir. 1975) (ruling that "[w]here verdicts in the same case are inconsistent on their faces indicating that the jury was confused, a new trial is certainly appropriate. . . .")

9

¶18. Apparently, all parties elected for strategic reasons to try both the bad-faith claim and the breach-of-contract/indemnity cases together, making full disclosure to the jury of the settlement agreement between Nabors and Malone. The case presented multiple legal theories, and the result was a completely confused jury.[5] Our rules provide that a trial court has broad discretion to consolidate or order separate trials for a cross-claim. Miss. R. Civ. P. 42(b).[6] Separate trials are appropriate when necessary to avoid undue confusion for the jury. What is clearly evident in retrospect was perhaps not so obvious to the court and the attorneys at the outset. Upon remand, we strongly urge the trial court to consider severing Nabors's cross-claim for trial.

## CONCLUSION

¶19. The judgments of the circuit court are reversed and remanded for proceedings consistent with this opinion.

¶20. **REVERSED AND REMANDED.**

---

[5]Three hours into deliberations, the jury sent a note to the court inquiring "Who will pay Gary Malone's future medical expenses, Nabors or Nabors's insurance company?"

[6]Mississippi Rule of Civil Procedure 42(b) provides that:

[t]he court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counter-claims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by Section 31 of the Mississippi Constitution of 1890.

Miss. R. Civ. P. 42(b).

**WALLER, C.J., CARLSON, P.J., DICKINSON AND KITCHENS, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION. RANDOLPH AND PIERCE, JJ., NOT PARTICIPATING.**

**CHANDLER, JUSTICE, DISSENTING:**

¶21. With respect for the majority, I would reverse and render the judgments against Gallagher Bassett. I would find that there was insufficient evidence of gross negligence, malice, or reckless disregard for the rights of Malone to support the verdict in his favor against Gallagher Bassett. I would further find that, under the facts presented, there was no legal theory that enabled Nabors to recover damages from Gallagher Bassett for breach of contract. Because the evidence presented at the trial was insufficient to support the verdicts, a new trial is unwarranted.

¶22. Gallagher Bassett specifically challenged the sufficiency of the evidence as to Malone's claim with its motion for a directed verdict at the close of evidence, and as to Nabors's claim with its motion for a JNOV. The denial of a directed verdict and the denial of a motion for a JNOV are reviewed under the same standard. ***Tupelo Redev. Agency v. Gray Corp., Inc.***, 972 So. 2d 495, 514 (Miss. 2007). This Court has stated:

> The standard of review for the denial of a directed verdict and a judgment notwithstanding the verdict is the same. ***Ala. Great S. R.R. Co. v. Lee***, 826 So. 2d 1232, 1235 (Miss. 2002). "This Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference[s] that may be reasonably drawn from the evidence." ***Id.*** at 1235 (quoting ***Steele v. Inn of Vicksburg, Inc.***, 697 So. 2d 373, 376 (Miss. 1997)). "If the evidence is sufficient to support a verdict in favor of the non-moving party, the trial court properly denied the motion." ***Henson v. Roberts***, 679 So. 2d 1041, 1044-1045 (Miss. 1996) (citations omitted). In other words, this Court considers "whether the evidence, as applied to the

11

elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *White v. Stewman*, 932 So. 2d 27, 32 (Miss. 2006).

*Spotlite Skating Rink, Inc. v. Barnes ex rel. Barnes*, 988 So. 2d 364, 368 (Miss. 2008).

*1. The Workers' Compensation Act and the tort of bad-faith failure to pay workers' compensation benefits.*

¶23.    A review of pertinent provisions of the Mississippi Workers' Compensation Act and of our bad-faith law is warranted.  The Act provides that compensation is payable for "disability or death of an employee from injury or occupational disease arising out of and in the course of employment, without regard to fault as to the cause of the injury or occupational disease."  Miss. Code Ann. § 71-3-7 (Rev. 2000).  The first installment of compensation becomes due on the fourteenth day after the employer has notice of the injury, but an employer disputing the right to compensation may file a petition to controvert with the Commission on or before the day the first installment is due.  Miss. Code Ann. § 71-3-37(2), (4) (Rev. 2000).  Automatic penalties for late payments are assessed in the amount of ten percent for payments not made pursuant to an award, and twenty percent for payments made pursuant to an award.  Miss. Code Ann. § 71-3-37(5), (6) (Rev. 2000).

¶24.    Section 71-3-9 of the Mississippi Workers' Compensation Act makes the Act the exclusive remedy available to an employee who has suffered a work-related injury.  *Miller v. McRae's, Inc*., 444 So. 2d 368, 370 (Miss. 1984).  Section 71-3-9 provides:

> The liability of an employer to pay compensation shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next-of-kin, and anyone otherwise entitled to recover damages at common law or otherwise from such

employer on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under this chapter, or to maintain an action at law for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, nor that the employee assumed the risk of his employment, nor that the injury was due to the contributory negligence of the employee.

Miss. Code Ann. § 71-3-9 (Rev. 2000). Regarding the exclusivity provision, it has been stated that:

Three main themes make up the "compensation principle" that underlies workers' compensation laws. The employer provides benefits for work injuries without regard to fault; the benefits are limited to those prescribed in the statute, and the employee gives up a common law tort claim for the compensable injury against the employer in exchange for the employer's providing the no-fault benefits.

John R. Bradley & Linda A. Thompson, Mississippi Workers' Compensation § 11:1 (2007).

¶25. In *Taylor v. U.S. Fidelity & Guaranty Co.*, 420 So. 2d 564 (Miss. 1982), this Court reviewed a trial court's dismissal of an employee's lawsuit against a carrier for bad-faith delay in paying workers' compensation benefits. The complaint had alleged that the carrier "negligently, carelessly, wrecklessly [sic], willfully and hazardiously [sic], failed, refused and neglected to process legitimate medical claims . . . ," causing mental distress and exacerbation of physical pain. *Id.* at 564. The Court determined that the Legislature had intended that a tort action of this kind be subject to the exclusivity clause. *Id.* at 566.

¶26. In *Southern Farm Bureau Casualty Insurance Co. v. Holland*, 469 So. 2d 55, 59 (Miss. 1984), this Court limited *Taylor* by finding that the Act's exclusivity clause does not bar an injured worker's action against a workers' compensation insurance carrier for the

13

commission of an intentional tort. Holland had alleged that she had suffered mental distress caused by the carrier's termination of her benefits, that the carrier had terminated her benefits in order to force an inadequate settlement of her claim, and that the carrier's actions amounted to tortious breach of contract, breach of fiduciary duties, and an intentional infliction of emotional distress. *Id.* Relying upon *Taylor*, the carrier argued that the action was barred by Section 71-3-9. *Id.* This Court distinguished *Taylor*, stating:

> A review of the *Taylor* record discloses without question that the pleading sounds in negligence. No intentional tort is alleged, as is present in the allegation of this case. The rule in *Taylor* is accordingly limited to cases where the injured worker attempts to sue the carrier for negligent refusal to pay. In the case sub judice the pleading alleges the withholding of compensation for no legitimate or arguable reason and in an effort to force a settlement for an inadequate amount, harassment regarding an auto insurance policy issued by the same company, refusal to pay medical bills, using economic pressure to force a settlement, all such acts with "grossness and recklessness" as to evince utter indifference to the plaintiff. The comparison of the pleading factually distinguishes the cases. This Court, therefore, concludes that *Taylor* does not control this case and has no application to cases alleging independent, intentional torts between a worker and the employer's compensation carrier.

*Id.* at 57. The Court recognized several reasons that actions against the carrier are barred when based on negligence, but not when based on intentional conduct: (1) a carrier's intentional failure to pay workers' compensation benefits does not arise out of the employee's work-related injury, rather, it is independently tortious conduct by the carrier; (2) a carrier is not the alter ego of the employer when the carrier's intentional conduct is alleged; (3) the statutory penalties were intended as the exclusive remedy for claims not

14

promptly paid by the carrier, not for intentional conduct; and (4) the statutory penalties are inadequate to deter carriers from intentional wrongdoing. *Id.* at 58.

¶27. Since *Holland*, the parameters of a common-law action for bad-faith nonpayment of workers' compensation benefits have become well-established. In *Luckett v. Mississippi Wood, Inc.*, 481 So. 2d 288, 290 (Miss. 1985), the Court expanded *Holland* to permit a bad-faith suit against an employer as well as a carrier. In *McCain v. Northwestern National Insurance Co.*, 484 So. 2d 1001, 1002 (Miss. 1986), the Court held that "[t]he same rules applicable to health, fire, casualty, accident, and other insurance policies are likewise applicable to workers' compensation insurance carriers." Punitive damages are available against an insurer that denies a claim without a legitimate or arguable reason, and acts with malice, gross negligence, or reckless disregard for the rights of others. *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1095 (Miss. 1996).

¶28. The Court has stated that, to succeed on a bad-faith claim, a workers' compensation claimant must show that the employer or carrier lacked "a legitimate or arguable reason to deny the benefits," and "that the denial constituted a willful or malicious wrong in disregard for [the claimant's] rights." *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 479 (Miss. 2002). Where there was a legitimate or arguable reason to delay or deny benefits, there is no basis for an award of punitive damages. *Id.* However, "the absence of an 'arguable reason' does not necessarily establish that the insurer acted with malice or with gross negligence or reckless disregard for the insured's rights." *Caldwell*, 686 So. 2d at 1098 (Miss. 1996) (quoting *Blue Cross & Blue Shield of Miss. v. Maas*, 516 So. 2d 495, 497 (Miss.

15

1987)).  This is because "we have repeatedly held that 'punitive damages are not mandated by the absence of an arguable reason . . . because the denial of the claim could be the result of honest mistake or oversight—ordinary or simple negligence.'" *Id.* (quoting *State Farm Fire and Cas. v. Simpson*, 477 So. 2d 242, 250 (Miss. 1985)).

¶29.   The Court has specifically set out the standard applicable to a bad-faith action against an insurance adjuster for nonpayment of claims.  *Bass v. California Life Ins. Co.*, 581 So. 2d 1087, 1090 (Miss. 1991).   An adjuster's relationship with the insured is purely contractual; it owes the insured no fiduciary duty.  *Id.* (quoting *Dunn v. State Farm Fire & Cas. Co.*, 711 F. Supp. 1359 (N.D. Miss. 1987)).  Rather, an adjuster's duty is "to investigate all relevant information and . . . make a realistic evaluation of a claim."  *Id.*  An adjuster can be liable for conduct constituting malice, reckless disregard for the rights of the insured, or gross negligence.  *Id.*  "However, an adjuster is not liable for simple negligence in adjusting a claim."  *Id.*  Thus, like an employer or carrier, an adjuster cannot be held liable for bad faith when the conduct at issue amounts to ordinary or simple negligence.  This Court applied this standard in *Gallagher Bassett v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004), to find that a claims adjuster's delay in paying uninsured motorist benefits due to her unfamiliarity with Mississippi insurance law was simple negligence as a matter of law, not bad faith.

     *2. The sufficiency of the evidence supporting the verdict in favor of Malone for bad-faith delay of payment.*

¶30.   Malone sought to prove that Gallagher Bassett's bad-faith failure to investigate and pay his legitimate workers' compensation claim caused him to delay having skin-graft

16

surgery, which proximately caused the amputation of his leg. His expert, Dr. Keith Melancon, testified to a reasonable degree of medical certainty that the delay caused an increase in infection that necessitated aggressive surgery, and caused or contributed to the eventual leg amputation. While there was voluminous evidence surrounding Gallagher Bassett's handling of Malone's claim, the only relevant evidence pertains to what occurred in August 2000, because it was Gallagher Bassett's conduct during precisely that time frame that Malone claimed to have delayed his skin-graft surgery. The appropriate analysis focuses on Gallagher Bassett's conduct in light of what Gallagher Bassett knew or reasonably should have known at that time.

¶31. The evidence of Gallagher Bassett's role in the delayed payment of workers' compensation benefits centered upon the conduct of a claims adjuster, Deborah Robichaux. Robichaux's only source for notice of a workers' compensation injury was Nabors. The evidence was that Robichaux had received notification from Nabors that Malone had a work-related injury and a pre-existing condition. Then, she had initiated a conversation with Malone's supervisor, Bobby Wallace, who had confirmed that Malone had cut his leg at work, that he had a pre-existing condition that affected the area of the cut, that he needed skin-graft surgery, and that the need for the skin graft was due either to the cut or to the pre-existing condition.

¶32. After her conversation with Wallace, Robichaux did nothing. She testified that it was Gallagher Bassett's practice not to investigate a Nabors workers' compensation claim until Nabors had transmitted a B-3 form, and she expected that a B-3 form would be submitted.

17

Nabors's claims coordinator, Alice Lankford, and Nabors's counsel, Laura Doerre, both agreed that a B-3 form was required for Gallagher Bassett to set up a claim file. Lankford testified that if a claim is reported by phone, the claim file should be set up after the B-3 form is obtained by the claims adjuster. Nabors's policy was to complete a B-3 form and transmit it to Gallagher Bassett any time a first-aid-only injury necessitated surgery or lost time; yet, it did not do so in this case. Nevertheless, Robichaux admitted that, when she did not receive a B-3 from Nabors, she should have requested one.

¶33. It is vital to evaluate Robichaux's conduct in light of the applicable law governing the compensability of workers' compensation claims. Workers' compensation benefits are payable for a work-related injury that aggravates, accelerates, or lights up a pre-existing condition, but no benefits are due for disability that is solely attributable to a pre-existing condition, or when the work-related injury no longer combines with the pre-existing condition to produce disability. *Rathborne, Hair & Ridgeway Box Co. v. Green*, 237 Miss. 588, 594, 115 So. 2d 674, 676 (1959). A federal court has recognized that in Mississippi, a pre-existing condition may be a complete defense to workers' compensation benefits, and an adjuster placed on notice of a pre-existing condition has "a valid legal basis . . . to spend some time investigating the relationship between the Plaintiff's prior injury and his work-place injury." *McClendon v. Wal-Mart Stores, Inc.*, 521 F. Supp. 2d 561, 566 (S.D. Miss. 2007). Thus, Robichaux's conversation with Wallace only placed her on notice of a possibility that Malone had suffered a compensable injury. Further investigation was needed for Robichaux to determine compensability. Viewing the evidence in the light most

18

favorable to Malone, Robichaux's next step should have been to commence an investigation of the claim.

¶34.    Considering all of the evidence in the light most favorable to Malone, I do not find that Robichaux's failure to investigate after her conversation with Wallace rises to the level of malice, reckless disregard for Malone's rights, or gross negligence. No evidence suggests that Robichaux acted maliciously or with reckless disregard for the consequences to Malone. Nor is there sufficient evidence of gross negligence. "'Gross negligence' is that course of conduct which, under the particular circumstances, discloses a reckless indifference to consequences without the exertion of any substantial effort to avoid them." *Dame v. Estes*, 233 Miss. 315, 318 101 So. 2d 644, 645 (1958). "Simple negligence" is the failure to exercise due care, and signifies conduct that amounts to heedlessness, inattention, or inadvertence. *Turner v. City of Ruleville*, 735 So. 2d 226, 229 (Miss. 1999) (citing *Beta Beta Chapter of Beta Theta Pi v. May*, 611 So. 2d 889, 895 (Miss. 1992)); *Green v. Ingram*, 608 S.E. 2d 917, 923 (Va. 2005).

¶35.    In August 2000, Robichaux lacked any knowledge that, without the immediate receipt of benefits, Malone would delay the surgery against medical advice. What she knew was that Malone needed skin-graft surgery for a possible work-related injury, and she expected further contact from Nabors. Although Robichaux should have followed up with Nabors, her failure to do so amounts to mere inadvertence when considered in light of the facts that: (1) Nabors's admitted practice was to send a B-3 form to prompt Gallagher Bassett to investigate a claim; (2) Robichaux had no notice that a claim definitely was going to be made; and (3)

19

Robichaux commenced an investigation once she received a B-3 form in November 2001. At worst, it appears that, in August 2000, Robichaux failed to follow up on a possible claim due to her own thoughtlessness. Her omission constituted mere inadvertence, heedlessness, or inattention, which constituted simple negligence. In my opinion, viewing the evidence in the light most favorable to the verdict, Malone proved that Gallagher Bassett's conduct amounted to nothing more than simple negligence.[7] Therefore, not only was Gallagher Bassett's conduct insufficient to support a finding of bad faith, but recovery against Gallagher Bassett for simple negligence was barred by the exclusivity clause of the Workers' Compensation Act. Miss. Code Ann. § 71-3-9 (Rev. 2000). The evidence was insufficient to support the verdict against Gallagher Bassett in favor of Malone.

¶36. I point out that a delay of virtually any length in the payment of workers' compensation benefits invariably will cause damages of some kind to the injured employee, such as a slight worsening of the work-related injury, emotional distress, or the like. The Workers' Compensation Act has established a balance between the interests of employers and employees: the employer provides compensation for work-related injuries without regard to fault, and the Act is the employee's exclusive remedy. *See* 9 John R. Bradley, Jr., Encyclopedia of Mississippi Law (Jeffrey Jackson & Mary Miller eds.) § 76:1 (2002). This balance is threatened if minor misconduct by the employer, carrier, or adjuster that causes

---

[7] I note that the trial court appeared to recognize the paucity of evidence supporting a heightened tort when the court refused to submit the issue of punitive damages to the jury.

a delay in payment is sufficient to permit an employee to recover damages at law. On this

point, a California appellate court aptly has stated:

> [M]inor delays in getting medical service, such as for a few days or even a few hours, caused by a carrier, could become the bases of independent suits, and these could be many and manifold indeed. The uniform and exclusive application of the law would become honeycombed with independent and conflicting rulings of the courts. The objective of the Legislature and the whole pattern of workmen's compensation could thereby be partially nullified.

*Taylor*, 420 So. 2d at 566 (quoting *Noe v. Travelers Ins. Co.*, 342 P. 2d 976, 979 (Cal. Dist.

Ct. App. 1959)).

¶37. I would reverse and render the verdict against Gallagher Bassett in favor of Malone.

> *3. The sufficiency of the evidence supporting the verdict in favor of Nabors for breach of contract.*

¶38. I turn to the verdict in favor of Nabors against Gallagher Bassett for breach of

contract. Gallagher Bassett argues that its conduct was not imputable to Nabors and could

not have rendered Nabors liable to Malone. At trial, Nabors's theory of recovery against

Gallagher Bassett was that, but for Gallagher Bassett's bad faith, Nabors would not have

been liable to Malone, and would not have incurred settlement and defense costs. Nabors

contended that Gallagher Bassett's bad-faith delay breached the contract with CNA requiring

Gallagher Bassett to provide fair and expeditious handling of Nabors's workers'

compensation claims, and the breach proximately caused Nabors to incur liability to Malone.

Nabors argued that its potential liability to Malone, based on Gallagher Bassett's bad faith,

prompted its Mary Carter settlement with Malone. Nabors's jury instruction D-33 permitted

the jury to find that Nabors had proven by a preponderance of the evidence that Gallagher

21

Bassett's breach of contract proximately caused or contributed to Nabors's damages, including:

> (1) the costs, benefits, and penalties associated with Gary Malone's workers' compensation claim and (2) the settlement and cost of defense, including attorney's fees, incurred in defense of both Gary Malone's bad faith action and Gary Malone's workers' compensation claim against Nabors Drilling USA, L.P. and that Nabors Drilling USA, L.P. would not have incurred but for Gallagher Bassett Services, Inc.'s breach of contract, if any.

¶39. In my opinion, Gallagher Bassett correctly argues that its acts were not imputable to Nabors. In *Luckett*, this Court held that an employer, as well as a carrier, may be held liable for bad-faith nonpayment of workers' compensation benefits. *Luckett*, 481 So. 2d at 290. However, when a carrier acts in bad faith, the carrier "ceases to be the 'alter ego' of the employer," but is involved in an independent relationship with the employee. *Holland*, 469 So. 2d at 58; *Pilate v. Am. Fed. Ins. Co.*, 865 So. 2d 387, 395 (Miss. Ct. App. 2004). The import of this rule is that an employer is not liable for the bad-faith acts of an insurance carrier, or, as in this case, the bad-faith acts of an insurance adjuster with whom the carrier has contracted to determine the compensability of claims. In the context of a fraudulent-joinder claim, the United States District Court for the Southern District of Mississippi determined that an employer who was free from any wrongdoing could not be held liable for the carrier's bad-faith nonpayment of a workers' compensation claim. *Toney v. Lowery Woodyards*, 278 F. Supp. 2d 786, 793 (S.D. Miss. 2003) (citing *Holland*, 469 So. 2d at 58). Because the employer and carrier are not alter egos when acting in bad faith, the employer

22

and carrier each are liable for their own bad-faith acts, and the bad-faith acts of one are not imputable to the other.

¶40.    I have concluded that the evidence was insufficient to support a finding that Gallagher Bassett acted in bad faith.  But even if Gallagher Bassett was guilty of bad faith, its bad faith was not imputable to Nabors.  *Holland*, 469 So. 2d at 58; *Pilate*, 865 So. 2d at 395; *Toney*, 278 F. Supp. 2d at 793.  Nabors settled the case because it perceived its potential liability to Malone; however, any liability which Nabors had to Malone could have arisen only from Nabors's own failure to comply with the Workers' Compensation Act concerning Malone's claim.  Evidently, Nabors settled with Malone to avoid this potential liability, and then sought to recover the settlement amount and defense expenses from Gallagher Bassett based on an "alter-ego" theory.  This Nabors could not do, because it was not liable as a matter of law for any bad-faith conduct committed by Gallagher Bassett.  I would reverse and render the verdict against Gallagher Bassett in favor of Nabors.